IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| AMERICAN FEDERATON OF LABOR AND CONGRESS OF INDUSTRIAL ORGANIZATIONS<br>815 Black Lives Matter Plaza NW,<br>Washington, DC 20006, | |
| | |
| INTERNATIONAL FEDERATION OF PROFESSIONAL & TECHNICAL ENGINEERS, AFL-CIO<br>513 C Street N.E.<br>Washington, DC 20002, | Case No. 1:25-cv-02445-PLF |
| | **FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |
| AMERICAN FEDERATION OF TEACHERS, AFL-CIO<br>555 New Jersey Avenue N.W.<br>Washington, DC 20001, | |
| | |
| METAL TRADES DEPARTMENT, AFL-CIO<br>815 Black Lives Matter Plaza, N.W.<br>Washington, DC 20006, | |
| | |
| INTERNATIONAL ORGANIZATION OF MASTERS, MATES & PILOTS, AFL-CIO<br>700 Maritime Boulevard, Suite B<br>Linthicum Heights, Maryland 21090, | |
| | |
| DISTRICT NO. 1, PACIFIC COAST DISTRICT, MARINE ENGINEERS' BENEFICIAL ASSOCIATION, AFL-CIO<br>444 North Capitol Street N.W., Suite 800<br>Washington, DC 20001, | |
| | |
| UNITED ASSOCIATION OF JOURNEYMEN AND APPRENTICES OF THE PLUMBING AND PIPEFITTING INDUSTRY, LOCAL 100, AFL-CIO<br>3010 Interstate 30<br>Mesquite, TX 75150, | |
| | |
| INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS, LOCAL UNION 26<br>4371 Parliament Place<br>Lanham, MD 20706, | |
| | |
| INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS, LOCAL UNION 1688 | |

1

P.O. Box 261
Pierre, SD 57501,

INTERNATIONAL BROTHERHOOD OF
ELECTRICAL WORKERS, LOCAL UNION 2080
P.O. Box 878
Lafayette, TN 37083,

INTERNATIONAL BROTHERHOOD OF
ELECTRICAL WORKERS, LOCAL UNION 2219
1647 S Chapel Drive
Springfield, MO 65809,

OFFICE AND PROFESSIONAL EMPLOYEES
INTERNATIONAL UNION
80 8th Avenue
New York, NY 10011,

INTERNATIONAL ASSOCIATION OF MACHINISTS
AND AEROSPACE WORKERS, AFL-CIO
9000 Machinists Place
Upper Marlboro, MD 20772,

                    Plaintiffs,

        v.

DONALD J. TRUMP
President of the United States
1600 Pennsylvania Avenue N.W.
Washington, D.C. 20500,

SCOTT KUPOR
Director
Office of Personnel Management
1900 E Street N.W.
Washington, D.C. 20415,

LEE M. ZELDIN
Administrator
Environmental Protection Agency
1200 Pennsylvania Avenue N.W.
Washington, D.C. 20460,

PETER HEGSETH
Secretary of Defense

U.S. Department of Defense
1000 Defense Pentagon
Washington, DC 20301,

KRISTI NOEM
Secretary of Homeland Security
U.S. Department of Homeland Security
2707 Martin Luther King Jr Ave SE
Washington, DC 20528,

CHRIS WRIGHT
Secretary of Energy
U.S. Department of Energy
1000 Independence Ave., SW
Washington, DC 20585,

       Defendants.

---

## FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

### INTRODUCTION

1.     Federal civilian workers have had the legal right to collectively bargain with their government agency employers since the early 1960s. When Congress adopted the Civil Service Reform Act of 1978, Congress found that "labor organizations and collective bargaining in the civil service are in the public interest." 5 U.S.C. § 7101(a). Congress codified an extensive labor-management relations framework for federal civil servants in Chapter 71 of Title 5 of the U.S. Code ("Chapter 71").

2.     Plaintiffs are labor organizations whose members include tens of thousands of federal workers. Many of these workers are employed in bargaining units that have had continuous union representation for purposes of collective bargaining for more than 50 years—across multiple presidential administrations and during wartime and peacetime.

3.      This lawsuit challenges President Trump's Executive Order No. 14251,

Exclusions from Federal Labor-Management Programs, 90 Fed. Reg. 14,553 (March 27, 2025)

("Executive Order"), which strips the vast majority of federal workers of their collective

bargaining rights, while preserving collective bargaining for police officers, firefighters, and

security guards. The Executive Order relies on the pretext that collective bargaining for all the

excluded units is incompatible with "national security," even though these workers have had

collective bargaining rights for decades.

4.      The Executive Order and Defendants' implementation of the Executive Order are

unconstitutional and a violation of the Administrative Procedure Act. As such, this Court should

invalidate the Executive Order and enjoin Defendants from implementing it. Three other lawsuits

challenging the Executive Order are already pending in this Court: *National Treasury Employees*

*Union v. Trump*, No. 25-cv-00935-PLF; *American Foreign Service Association v. Trump*, No. 25-

cv-1030-PLF; and *Federal Education Association v. Trump*, No. 25-cv-01362-PLF.

## JURISDICTION

5.      This Court has jurisdiction under 28 U.S.C. § 1331 because Plaintiffs allege

claims arising under the U.S. Constitution and the Administrative Procedure Act.

## VENUE

6.      Venue is proper in the District of Columbia pursuant to 28 U.S.C. § 1391(e)

because some Plaintiffs are headquartered in this District, because Defendants reside in this

District, and because a substantial part of the events or omissions giving rise to Plaintiffs' claims

occurred in this District.

**PARTIES**

7.     Plaintiff American Federation of Labor and Congress of Industrial Organizations ("AFL-CIO") is a federation of 63 national and international labor unions that represent nearly 15 million working people. The other Plaintiffs are labor organizations affiliated with the AFL-CIO whose members include tens of thousands of federal employees adversely affected by the Executive Order and the Defendants' implementation of the Executive Order. Plaintiffs bring this action on their own behalf, on behalf of their affiliates, and on behalf of their members.

8.     Plaintiff International Federation of Professional & Technical Engineers, AFL-CIO ("IFPTE") is a labor organization whose local unions serve as the bargaining representatives for federal employees at multiple agencies. IFPTE Local 20 is the bargaining representative of professional employees of the Environmental Protection Agency's Region 9, which covers Nevada, California, Arizona, Hawaii, the Pacific Islands, and 148 tribal nations. IFPTE Locals 8A, 49, 86, 96, 97, 98, 131, 259, 561, 777, and 852 are the bargaining representatives of units of civilian employees of United States Army Corps of Engineers. IFPTE Locals 1, 3, 4, 12, 16, 22, 32, and 121 are the bargaining representatives of units of civilian employees of the Naval Sea Systems Command. IFPTE Local 7 represents a bargaining unit at the Defense Logistics Agency. IFPTE Local 1437 represents a unit of professionals who work at an Army facility in New Jersey. IFPTE Locals have represented federal employee bargaining units for more than 45 years.

9.     Plaintiff American Federation of Teachers, AFL-CIO ("AFT"), through its affiliate the Overseas Federation of Teachers, represents a bargaining unit of schoolteachers who are employed by the Department of Defense Education Activity ("DoDEA"), a subdivision of the Department of Defense. DoDEA operates public schools serving prekindergarten through 12th

grade dependents of military and civilian families stationed overseas. AFT's representation of this schoolteacher bargaining unit predates the adoption of Chapter 71 in 1978.

10.     Plaintiff Metal Trades Department, AFL-CIO is a labor organization that, through its affiliated metal trades councils, serves as the bargaining representative for more than 20,000 blue-collar trades workers employed by various subdivisions of the Department of Defense. These bargaining units include trades workers employed at facilities in California, Connecticut, District of Columbia, Georgia, Hawaii, Indiana, New Hampshire, New Jersey, Nevada, Pennsylvania, Rhode Island, Virginia, and Washington State. Metal trades councils also serve as the bargaining representatives of trades workers employed by the U.S. Coast Guard (part of the Department of Homeland Security) in Maryland and Virginia. Some of these bargaining units of trades workers have had union representation since the 1960s.

11.     Plaintiff International Organization of Masters, Mates & Pilots, AFL-CIO ("MM&P") is a labor organization that serves as the bargaining representative for about 600 civilian mariners employed to provide transportation and supply services to various subdivisions of the Navy and the U.S. Army Corps of Engineers. MM&P has represented its largest naval unit, composed of licensed deck officers sailing supply ships, since the early 1970s. Plaintiff District No. 1, Pacific Coast District, Marine Engineers' Beneficial Association, AFL-CIO ("MEBA") is a labor organization that serves as the bargaining representative for approximately 450 civilian mariners on vessels that provide ocean transportation of supplies for the Navy. MEBA also serves as the bargaining representative for approximately 50 civilian mariners on vessels operated by the U.S. Army Corps of Engineers that maintain and improve navigation channels and waterways. MEBA has represented its Navy unit since at least 1973 and its U.S. Army Corps of Engineers unit since at least 1977.

12.    Plaintiff United Association of Journeymen and Apprentices of the Plumbing and Pipefitting Industry, Local 100, AFL-CIO ("UA Local 100") is a labor organization that serves as the bargaining representative of approximately 60 blue-collar trades workers at an Army depot in New Boston, Texas. The unit has been represented by a local union of the United Association of Journeymen and Apprentices of the Plumbing and Pipefitting Industry for more than 20 years. UA Local 100 replaced a different UA local union that previously represented the unit.

13.    Plaintiff International Brotherhood of Electrical Workers, Local Union 26, AFL-CIO ("IBEW Local 26") is a labor organization that serves as the bargaining representative for a bargaining unit of wage grade employees employed by the Office of the Secretary of Defense, Washington Headquarters Services, Facilities Services Directorate, Federal Facilities Division. The unit has been represented by IBEW Local 26 since 1991.

14.    Plaintiff International Brotherhood of Electrical Workers, Local Union 1688, AFL-CIO ("IBEW Local 1688") is a labor organization that serves as the bargaining representative for power production wage board employees of the U.S. Army Corps of Engineers, Omaha District, a subdivision of the Department of Defense, at six major dams along the main stem of the Missouri River. Specifically, IBEW Local 1688 represents employees at Fort Peck Dam in Montana, Garrison Dam in North Dakota, and Oahe, Big Bend, Fort Randall, and Gavins Point Dams in South Dakota.

15.    Plaintiff International Brotherhood of Electrical Workers, Local Union 2080, AFL-CIO ("IBEW Local 2080") is a labor organization that serves as the bargaining representative for all permanent employees working at hydropower plants and navigation locks, and all permanent employees of repair parties, specialized maintenance crews and fleet operations employed by the U.S. Army Corps of Engineers, Nashville District, a subdivision of

the Department of Defense. The unit has been represented by IBEW Local 2080 since at least the

1970s .

16.     Plaintiff International Brotherhood of Electrical Workers, Local Union 2219,

AFL-CIO ("IBEW Local 2219") is a labor organization that serves as the bargaining

representative for two separate bargaining units at the U.S. Army Corps of Engineers, Little Rock

District, a subdivision of the Department of Defense. The first unit—which includes personnel

employed at the various hydroelectric generating plants, including adjacent dams, pumping

stations, and overlooks assigned to the hydroelectric generating plants and closely related

facilities within the jurisdiction of the Little Rock District Corps of Engineers—has been

represented by IBEW Local 2219 since 1966. The second unit—which includes all full-time and

part-time non-professional employees, Classification Act (GS) and Wage Grade employees of the

Little Rock District, including the employees of the Navigation Branch of the Russellville

Resident Office—has been represented by IBEW Local 2219 since 1995.  Plaintiff IBEW Local

2219 also serves as the bargaining representative for all wage board personnel employed by the

U.S. Army Corps of Engineers, Fort Worth District, a subdivision of the Department of Defense,

at the Whitney Dam and Hydroelectric Plant in Texas.

17.     Plaintiff Office and Professional Employees International Union, AFL-CIO

("OPEIU") is a labor organization that, through its affiliate Local 2001, represents a bargaining

unit of professional and non-professional federal employees working at the Oak Ridge,

Tennessee facility of the U.S. Department of Energy ("DOE"). The bargaining unit includes

scientists, engineers, industrial hygienists, accountants, and contract specialists, among other

workers. OPEIU Local 2001 has represented this bargaining unit since 1981.

18.     Plaintiff International Association of Machinists and Aerospace Workers, AFL-CIO ("IAM") is a labor organization that, through its affiliate Locals 97, 174, 225, 282, 726, 1859, 1998, 2049, 2296, 2297, 2424, 2783, and 2902, represents federal civilian employees of various subdivisions of the Department of Defense at facilities throughout the United States. Additionally, IAM Local 2203 represents a unit of Coast Guard employees in Elizabeth City, North Carolina.  Many of these bargaining units have had union representation for decades.

19.     Defendant Donald J. Trump is the President of the United States of America. He is sued in his official capacity.

20.     Defendant Scott Kupor is the Director of the U.S. Office of Personnel Management. He is sued in his official capacity.

21.     Defendant Lee M. Zeldin is the Administrator of the Environmental Protection Agency. He is sued in his official capacity.

22.     Defendant Peter Hegseth is the United States Secretary of Defense. He is sued in his official capacity.

23.     Defendant Kristi Noem is the United States Secretary of Homeland Security. She is sued in her official capacity.

24.     Defendant Chris Wright is the United States Secretary of Energy. He is sued in his official capacity.

## BACKGROUND

**A.     Congress determined that federal employees should have collective bargaining rights by adopting Chapter 71.**

25.     An "outdated patchwork of statutes and rules built up over almost a century" governed federal employment before 1978. *United States v. Fausto*, 484 U.S. 439, 444 (1988). Congress reacted to this state of disarray through its enactment of the Civil Service Reform Act

of 1978, which "overhauled the civil service system." *Lindahl v. Office of Pers. Mgmt.*, 470 U.S. 768, 773 (1985).

26.     Before Congress passed the Civil Service Reform Act, collective bargaining in the federal civil service already had been authorized and governed by two executive orders. The first was issued in 1962 by President Kennedy. *See* Executive Order 10,988, Employee-Management Cooperation in the Federal Service, 27 Fed. Reg. 551 (Jan.17, 1962). The second was issued in 1969 by President Nixon. *See* Exec. Order 11,491, Labor-Management Relations in the Federal Service, 34 Fed. Reg. 17,605 (Oct. 31, 1969). By the mid-1970s, about 60 percent of federal civilian employees were represented by unions. Thus, Congress was able to rely on a pre-existing history of productive collective bargaining for federal employees when Congress adopted the Civil Service Reform Act.

27.     "In passing the Civil Service Reform Act, Congress unquestionably intended to strengthen the position of federal unions and to make the collective-bargaining process a more effective instrument of the public interest than it had been under the [previous] regime." *Bureau of Alcohol, Tobacco, & Firearms v. Fed. Labor Rel. Auth.*, 464 U.S. 89, 107 (1983). Accordingly, the Federal Service Labor-Management Relations Statute, 5 U.S.C. § 7101 *et seq.*, enacted as Title VII of the Act and codified as Chapter 71 of Title 5 of the United States Code ("Chapter 71"), was a central aspect of Congress's federal civil service reform.

28.     Chapter 71 sets forth a comprehensive framework governing collective bargaining in the federal civil service "designed to meet the special requirements and needs of the Government." 5 U.S.C. § 7101(b). It rests on Congress's explicit finding that "the statutory protection of the right of employees to organize, bargain collectively, and participate through

labor organizations of their own choosing in decisions which affect them … safeguards the public interest." 5 U.S.C. § 7101(a)(1).

29.     Through Chapter 71, Congress assigned federal sector labor organizations the job of "act[ing] for" and "negotiat[ing] collective bargaining agreements covering" all employees in the bargaining units that they are elected to represent. 5 U.S.C. § 7114(a).

30.     Congress granted federal sector labor unions this responsibility based on its conclusion that the work of labor organizations "contributes to the effective conduct of public business" and "facilitates and encourages the amicable settlement of disputes between employees and their employers involving conditions of employment." 5 U.S.C. § 7101(a)(1).

31.     Chapter 71 generally requires bargaining over matters affecting conditions of employment, *see* 5 U.S.C. § 7103(a)(14), though this does not extend to matters established by federal statute or by government-wide regulations. *Id.* §§ 7103(a)(14)(c) & 7117(a)(2). Federal employees also have no right to engage in strikes or work stoppages. *Id.* § 7311.

32.     Congress excluded some agencies or offices within agencies from Chapter 71's coverage. These include the Federal Bureau of Investigation, the Central Intelligence Agency, the National Security Agency, and the United States Secret Service. 5 U.S.C. § 7103(a)(3).

33.     Chapter 71 also gives the President narrow authority to exclude additional agencies from the Chapter 71's coverage. He may only do so if he determines that (1) the "agency or subdivision has as a primary function intelligence, counterintelligence, investigative, or national security work" and (2) Chapter 71 "cannot be applied to that agency or subdivision in

a manner consistent with national security requirements and considerations." 5 U.S.C.

§ 7103(b)(1).

### B.    Prior Presidential administrations have already excluded sensitive security and intelligence subdivisions from Chapter 71.

34.    Shortly after the adoption of Chapter 71, President Carter issued an order

excluding certain intelligence and security agencies from Chapter 71. Exec. Order No. 12171, 44

Fed. Reg. 66565 (Nov. 19, 1979). Over time, other Presidents issued narrowly targeted orders

excluding additional agency subdivisions that were clearly engaged in sensitive intelligence

and/or national security work from Chapter 71, including when the government was reorganized

to create the Department of Homeland Security.[1] Those narrowly targeted national security

exclusions covered a tiny fraction of the federal workforce and most involved subdivisions with

no prior history of collective bargaining.

35.    During the 47 years since the adoption of Chapter 71, no President excluded or

sought to exclude any of the Plaintiffs' bargaining units at issue in this case from the protections

of Chapter 71. Nor did any serious commentator even suggest that the application of Chapter 71

to these bargaining units is inconsistent with national security.

36.    At the outset of his first term in office, in January 2020, President Trump

attempted to delegate his authority under 5 U.S.C. § 7103(b)(1) to "issue orders excluding

Department of Defense agencies or subdivisions thereof" from coverage under Chapter 71 to the

Secretary of Defense. 85 Fed. Reg. 10033 (Jan. 29, 2020). However, then Secretary of Defense

---

[1] Exec. Order No. 12,338, 47 Fed. Reg. 1,369 (Jan. 11, 1982); Exec. Order No. 12,410, 48 Fed. Reg. 13,143 (March 28, 1983); Exec. Order No. 12,559, 51 Fed. Reg. 18,761 (May 20, 1986); Exec. Order No. 12,666, 4 Fed. Reg. 1,921 (Jan. 12, 1989); Exec. Order No. 12,671, 4 Fed. Reg. 11,157 (March 14, 1989); Exec. Order No. 12681, 54 Fed. Reg. 28,997 (July 6, 1989); Exec. Order No. 12,693, 54 Fed. Reg. 40,629 (Sept. 29, 1989); Exec. Order No. 13,039, 62 Fed. Reg. 12,529 (March 11, 1997); Exec. Order No. 13,252, 67 Fed. Reg 1,601 (Jan. 7, 2002); Exec. Order No. 13,381, 70 Fed. Reg. 37,953 (June 27, 2005); Exec. Order 13,480, 67 Fed. Reg. 1,601 (Nov. 26, 2008); Exec. Order No. 13,760, 82 Fed. Reg. 5,325 (Jan. 12, 2017); Exec. Order No. 13,869, 84 Fed. Reg. 18,125, (April 24, 2019).

Mark Esper testified before Congress that he did not request the authority from the President and could not recall a time in the past that would have warranted this use of authority. Mark Esper Testimony, House Armed Services Committee (Feb. 27, 2020).

37.    A bipartisan group of U.S. senators strongly objected to President Trump's attempt to strip bargaining rights from Department of Defense civilian employees, explaining that "collective bargaining is not only compatible with this needed flexibility, but also is a key component in preserving flexibility by giving employees a voice in the system and providing avenues for management to receive feedback." Erich Wagner, "Senators from Both Political Parties Urge Trump to 'Reconsider' Defense Union Memo," *Government Executive* (Feb. 28, 2020). They further noted that "exemptions permitted by the process are not meant to be given widely to an entire department as a sweeping declaration, but to be carefully considered." *Id.*

38.    Defense Secretary Esper never attempted to exercise the authority delegated to him by President Trump to exclude any Department subdivisions from Chapter 71.

39.    On February 24, 2021, President Biden rescinded the delegation to the Secretary of Defense that purported to allow the secretary to exercise the president's authority under 5 U.S.C. § 7103(b)(1). Exec. Order 14018 § 1, 86 Fed. Reg. 11855 (Feb. 24, 2021).

**C.    Plaintiffs have had stable and mutually beneficial collective bargaining relationships with federal agencies for decades without any interference with national security.**

40.    As stated above, many of Plaintiffs' federal employee bargaining units have had union representation for decades, with many union-represented bargaining units pre-dating the adoption of Chapter 71 in 1978. For example, one of the Metal Trades Department's bargaining units has represented blue-collar trades workers at a Coast Guard yard in Maryland since 1964.

Plaintiff IBEW Local 2219 has represented a bargaining unit at the Army Corps of Engineers since 1966.

41.    Federal agencies have engaged in collective bargaining with these bargaining units during the Viet Nam War, the Cold War and the fall of the Soviet Union, 9/11 and the War on Terror, as well as during the war in Afghanistan, the longest war the United States has ever fought.  At no time has the application of Chapter 71 to these bargaining units ever been inconsistent with national security—nor was there ever any serious suggestion to the contrary.

**D.    President Trump's Executive Order uses the pretext of national security to strip most federal employees of their collective bargaining rights while preserving collective bargaining for police and firefighters.**

42.    On March 27, 2025, President Trump issued Executive Order No. 14251, Exclusions from Federal Labor-Management Programs, 90 Fed. Reg. 14,553 (March 27, 2025) ("Executive Order"), thereby depriving most federal civil service workers of their rights under Chapter 71.

43.    The Executive Order is staggering and unprecedented in its breadth. It sweeps up four Cabinet departments in their entirety, including the Department of Defense; two Cabinet departments, each with a single limited exception; dozens of agencies and subdivisions within five other Cabinet departments, including the Department of Homeland Security; and seven independent agencies in their entirety, including the Environmental Protection Agency. The Executive Order eliminates collective bargaining for about 75 percent of all federal employees represented by unions. Erich Wagner, "Trump order aims to outlaw most government unions on 'national security' grounds," *Government Executive* (March 27, 2025), https://perma.cc/6KF7-7SJY.

44.    On the same day the Executive Order was publicly released, Acting Director of Office of Personal Management ("OPM"), Charles Ezell, issued a memorandum providing guidance to agency leadership regarding implementation of the Executive Order. *See* Memorandum of Charles Ezell, "Guidance on Executive Order Exclusions from Federal Labor-Management Programs" (March 27, 2025) ("OPM Guidance"), https://perma.cc/V6WH-435Z. The OPM Guidance declares that Chapter 71 "will no longer apply" to the agencies and agency subdivisions listed in the Executive Order, that "those agencies and subdivisions are no longer required to collectively bargain with Federal unions," and that the affected unions "lose their status as the 'exclusive[ly] recogni[zed]' labor organizations for employees of the agencies and agency subdivisions covered by" the Executive Order. *Id.* at 1, 3 (alterations in original). The OPM Guidance also directs agencies to "cease participating in grievance procedures after terminating their CBAs." *Id.* at 5.

45.    Section 6 of the Executive Order directs agency heads, "upon termination of the applicable collective bargaining agreement," to reassign employees performing representational duties pursuant to official-time arrangements in CBAs, terminate pending grievance proceedings, and terminate proceedings before the Federal Labor Relations Authority involving exceptions or arbitral awards or unfair labor practices. *Id.*

46.    The Executive Order is wholly unmoored from the narrow authority that Congress has granted the President to exclude agencies or agency subdivisions from Chapter 71 where (a) the agency or subdivision has a "*primary* function [of] intelligence, counterintelligence, investigative, or national security work"; and (b) the provisions of Chapter 71 "*cannot* be applied in a manner consistent with national security requirements and considerations." 5 U.S.C. § 7103(b)(1) (emphases added). Many, if not most, of the agencies and agency subdivisions swept

up in the Executive Order's dragnet—including Cabinet departments such as the Department of Veterans Affairs and the Department of the Treasury, and independent agencies such as the Environmental Protection Agency, the Federal Communications Commission, and the General Services Administration—do little to no national security work, much less do they have "as a *primary* function intelligence, counterintelligence, investigative, or national security work." Nor can it be reasonably said that the collective bargaining provisions of Chapter 71 "*cannot* be applied in a manner consistent with national security requirements and considerations" to the panoply of executive departments, agencies, and agency subdivisions swept up in the Executive Order's dragnet—including bargaining units that have had continuous union representation for more than 50 years.

47.     At the same time, however, Section 2 of the Executive Order contains a blanket carveout that preserves collective bargaining for all "police officers, security guards, [and] firefighters." This carveout of safety and law enforcement workers makes no logical sense in light of the exclusion of most other federal employees from Chapter 71 on the purported ground of national security.

48.     For example, both Plaintiff Metal Trades Department and Plaintiff IFPTE have bargaining units at the Portsmouth Naval Shipyard that are excluded by the Executive Order, whereas the International Association of Firefighters ("IAFF") has a bargaining unit at the Portsmouth Naval Shipyard that is *not* excluded by the Executive Order. Plaintiffs are informed and believe and thereon allege that the Executive Order creates the same situation at multiple other agency subdivisions across the government, including many other Department of Defense facilities: Employees represented by some unions are stripped of their collective bargaining

rights, while police officers, security guards and firefighters employed by the same subdivisions retain their collective bargaining rights.

49.     A White House "Fact Sheet" accompanied the Executive Order. *See* The White House, "Fact Sheet: President Donald J. Trump Exempts Agencies with National Security Missions from Federal Collective Bargaining Requirements" (March 27, 2025), https://perma.cc/5M2G MUSH. In that document, the White House rails against "hostile Federal unions" that, in the White House's view, have "declared war on President Trump's agenda." *Id.* The White House Fact Sheet declares that "President Trump supports constructive partnerships with unions who work with him." *Id.* The Fact Sheet emphasizes: *"**Law Enforcement Unaffected.** Police and firefighters will continue to collectively bargain." Id.* (emphasis in original).

50.     The country's largest law enforcement union, the National Fraternal Order of Police ("FOP"), endorsed President Trump's candidacy in 2016, 2020, and 2024,[2] and President Trump has regularly touted those endorsements.[3] And the largest firefighters' union in the country, the IAFF, after having exclusively supported Democratic presidential candidates for more than 50 years, broke with that tradition, declining to endorse either candidate in the 2016

---

[2] FOP Press Release: FOP Endorses Trump! (Sept. 6, 2024), https://perma.cc/D498-5GEE; FOP Press Release: Fraternal Order of Police Endorses Trump for President (Sept. 4, 2020), https://perma.cc/WW8Q-L2TW; FOP Press Release: Fraternal Order of Police Endorses Trump!! (Sept. 16, 2016), https://perma.cc/NWZ3-3G8F.

[3] *See, e.g.*, Donald J. Trump, Remarks at a Campaign Rally in Atlanta, Georgia (Oct. 15, 2024), https://perma.cc/98ZS-G3V2 ("I was also honored to receive the endorsement of the Fraternal Order of Police. Something they don't do easily. … 400,000 law enforcement officers nationwide."); Trump Campaign Press Release: President Trump Is Backing The Blue, And They're Backing Him (Sept. 10, 2020), https://perma.cc/5V84-JF8D; Presidential Debate at Hofstra University (Sept. 26, 2016), https://perma.cc/W697-5RH2 ("I just got today the, as you know, the endorsement of the Fraternal Order of Police ... We have endorsements from, I think, almost every police group, very—I mean, a large percentage of them in the United States.").

and 2024 elections;[4] and in 2020, then-candidate Trump touted his endorsement by one of IAFF's larger chapters.[5]

51.    The decision by a labor organization whether to endorse or support a political candidate or political party is not a relevant or permissible consideration for purposes of excluding agencies or agency subdivisions from collective bargaining pursuant to 5 U.S.C. § 7103(b)(1).

**E.    Defendant Hegseth, without providing any reasoning, exempted only a tiny subset of Department of Defense Employees from the Executive Order.**

52.    Section 4 of the Executive Order "delegate[s] authority under 5 U.S.C. § 7103(b)(1)" to the Secretaries of Defense and Veterans Affairs to "suspend[] the application" of the Executive Order's exclusion "to any subdivisions of the departments they supervise, thereby bringing such subdivisions under the coverage of [Chapter 71]" upon their certification that the provisions of Chapter 71 "can be applied to such subdivision in a manner consistent with national security requirements and considerations."

53.    Defendant Hegseth did not exercise his delegated authority to exempt any of Plaintiffs' Department of Defense ("DOD") bargaining units at issue here from the Executive Order. Rather, in an order dated April 17, 2025, Defendant Hegseth stated that Chapter 71 "can be applied … in a manner consistent with national security requirements and considerations" only to "federal wage system employees in the trades" who work in four DOD subdivisions.

---

[4] Katherine Fung & Joe Edwards, "IAFF Under Fire for Not Endorsing Female Presidential Hopefuls" *Newsweek* (Oct. 4, 2024), https://perma.cc/6PPH-6L6F ("The union … announced Thursday that the group's executive board voted … not to support Vice President Kamala Harris nor former President Donald Trump. It is only the second time that the group has refused to back a Democratic presidential candidate since 1960, the only other time being in 2016 when Hillary Clinton was on the ballot.").

[5] Trump Campaign Press Release - Philadelphia Firefighters' and Paramedics' Union Endorses President Donald J. Trump, Applauds His Strong Support for First Responders (Sept. 29, 2020) https://perma.cc/BLS8-PSUN.

DOD, Executive Order 14251 Certification, 90 Fed. Reg. 17,052 (April 23, 2025). Those

subdivisions are the following:

> "(a) Letterkenny Munition Center, US Army Aviation and Missile Command, United States Army," 90 Fed. Reg. at 17,052, which, among other things, maintains air-to-air and air-to-ground precision guided missiles stores, serves as an ammunition supply depot for all DOD armed services, and demilitarizes tactical missiles and conventional munitions, see https://www.jmc.army.mil/Installations.aspx?id=Letterkenny;

> "(b) Air Force Test Center, Air Force Materiel Command, Department of Air Force," 90 Fed. Reg. at 17,052, which conducts research and development, testing, and evaluation of manned and unmanned aircraft for the Air Force, see https://www.afmc.af.mil/About Us/Fact-Sheets/Display/Article/1614225/air-force-test-center/;

> "(c) Air Force Sustainment Center, Air Force Materiel Command, Department of Air Force," 90 Fed. Reg. at 17,052, which provides depot-maintenance and supply-chain management services, as well as operations and installation support for Air Force weapons systems ranging from fighter jets to intercontinental ballistic missiles, *see* https://www.afmc.af.mil/About-Us/Fact-Sheets/Display/Article/2828599/air-force sustainment-center/; and

> "(d) Fleet Readiness Center Southeast," 90 Fed. Reg. at 17,052, which provides aircraft repair and technical services for the U.S. Navy, see https://frcse.navair.navy.mil/.

54.    There is no conceivable justification under Section 7103(b) for Defendant

Hegseth to preserve collective bargaining for a subset of employees in these four DOD

subdivisions while maintaining the Executive Order's exclusion of Plaintiffs' DOD bargaining

units at issue here, some of which have had union representation for more than 50 years.

55.    Defendant Hegseth did not provide any reasoned explanation for his decision to

exempt these bargaining units but not Plaintiff's DOD bargaining units.

56.    Nor is there any conceivable justification under Section 7103(b) for Defendant

Hegseth to deprive these DOD employees of union representation when more than 25 separate

DOD bargaining units of police and firefighters have collective bargaining representation.

**F.    The Executive Order has caused and will continue to cause irreparable harm to Plaintiffs and their members.**

57.    Plaintiffs' bargaining units have operative collective bargaining agreements with federal agencies. These CBAs are valid, bilateral contracts. After issuance of the Executive Order, the subdivisions of the Department of Defense, Department of Homeland Security, and Environmental Protection Agency that employ Plaintiffs' bargaining unit workers unilaterally stopped processing grievances, thereby depriving the workers of any means of enforcing the CBAs. The agency subdivisions also ceased participating in grievance arbitrations with respect to grievances regarding matters occurring before and after the Executive Order. Defendants' implementation of the Executive Order has thereby prevented Plaintiffs from enforcing contractual rights and protecting their members.

58.    The agency subdivisions have also unilaterally ceased transmitting bargaining unit workers' voluntary union dues payments, as required by CBAs and by Chapter 71, thereby cutting off the income of union representatives. As a consequence, Plaintiffs have lost and continue to lose revenue that pays for the representation of the bargaining unit workers. Developing an alternative system for members to pay dues is time-consuming and expensive, such a system will be less reliable than payroll deduction.

59.    Plaintiffs will also lose members because workers have far less incentive to join a union when the union has lost its status as the collective bargaining representative, thereby eliminating the union's core function. The Executive Order also deprives the workers of vital statutory protections, such as the right to engage in union activity "freely and without fear of penalty or reprisal," 5 U.S.C. § 7102, that protect their right to join unions.  The Executive Order also harms Plaintiff AFL-CIO because the AFL-CIO receives per capita payments from its affiliated unions based on the number of workers they represent.

60.     Defendants initially refrained from terminating their collective bargaining agreements after the Executive Order was issued, apparently because they recognized the dubious legality of the Executive Order. OPM guidance stated that federal agencies should not terminate their collective bargaining agreements pending the outcome of litigation. In early August 2025, however, federal agencies began to change their position even though no final judgment had issued about the validity of the Executive Order.  The Environmental Protection Agency notified one of Plaintiff IFPTE's locals in early August 2025 that the Environmental Protection Agency was unilaterally terminating its collective bargaining agreement. The Coast Guard notified one of Plaintiff Metal Trades Department's councils in early August 2025 that the Coast Guard was unilaterally terminating its collective bargaining agreement.  On August 13, 2025, OPM issued revised guidance that federal agencies were now free to unilaterally terminate their collective bargaining agreements.

61.     Plaintiffs are informed and believe that, unless enjoined by this Court from implementing the Executive Order, the remaining Defendants will terminate their collective bargaining agreements for Plaintiffs' bargaining units. Section 6 of the Executive Order directs agency heads, "upon termination of the applicable collective bargaining agreement," to reassign employees performing representational duties pursuant to official-time arrangements in CBAs, terminate pending grievance proceedings, and terminate proceedings before the Federal Labor Relations Authority involving exceptions or arbitral awards or unfair labor practices. All these actions will cause irreparable harm to Plaintiffs and their members.

**CLAIMS FOR RELIEF**

**COUNT ONE**
**ULTRA VIRES ACTION IN VIOLATION OF STATUTE**
**(All Plaintiffs v. All Defendants)**

62.     Plaintiffs incorporate paragraphs 1 to 61 above by reference as if fully set forth

herein.

63.     Under the authority granted by Congress in 5 U.S.C. § 7103(b)(1), the President

may exclude an "agency or subdivision" from Chapter 71 only if two specific conditions are met:

(a) "the agency or subdivision has as a primary function intelligence, counterintelligence,

investigative, or national security work," and (2) "the provisions of [Chapter 71] cannot be

applied to that agency or subdivision in a manner consistent with national security requirements

and considerations."

64.     The sweeping, blunderbuss Executive Order—which excludes about 75% of

federal employees heretofore represented by federal unions under Chapter 71—is wholly

unmoored from Section 7103(b)'s conditions, contradicts the statute, and exceeds the authority

granted to the President.

65.     As an initial matter, the authority granted by Section 7103(b) is to exclude an

"agency or subdivision" from Chapter 71, not to pick and choose among unions to favor those

unions that support the President or his political party. The Executive Order does not exclude

entire agencies or subdivisions because the Executive Order provides that it does not exclude

"the immediate, local employing offices of any agency police officers, security guards, or

firefighters."  For example, there are more than 25 separate bargaining units of police officers,

firefighters or security guards employed by subdivisions within the Department of Defense

alone. Yet the Executive Order excludes other civilian employees of the Department of Defense

from Chapter 71, while continuing to provide coverage for employees of the same subdivisions who are police officers, firefighters, and security guards.

66.     The staggering breadth of the Executive Order also shows that it could not have been based on a determination that the excluded agencies or subdivisions have "as a primary function intelligence, counterintelligence, investigative, or national security work," which is the threshold requirement for potential exclusion under Section 7103(b). For example, the Executive Order excludes the Environmental Protection Agency, which has a bargaining unit represented by one of plaintiff IFPTE's affiliates, even though "intelligence, counterintelligence, investigative, or national security work" is not a "primary function" of the Environmental Protection Agency. Similarly, the Executive Order excludes the Department of Defense Education Activity ("DoDEA"), which has a bargaining unit represented by plaintiff AFT's Overseas Federation of Teachers, even though that subdivision operates a school system for prekindergarten through 12th grade educational programs and does not have as a "primary function" the performance of "intelligence, counterintelligence, investigative, or national security work." There are many other examples of agencies or subdivisions excluded by the Executive Order that do not even arguably meet the first of the necessary statutory criteria for exclusion.

67.     The staggering breadth of the Executive Order also shows that it could not have been based on a  determination that "the provisions of [Chapter 71] cannot be applied to that agency or subdivision in a manner consistent with national security requirements and considerations." The Executive Order excludes civilian bargaining units that have been

continuously represented by Plaintiffs or their local affiliates for more than 50 years without any interference with "national security requirements and considerations."

68.     Because the Executive Order goes beyond the narrow authority granted by Section 7103(b) and thereby impermissibly effectuates a partial repeal of Chapter 71, the Executive Order is ultra vires and violates the Constitution's separation of executive from legislative powers. For the same reason, Defendants' implementation of the invalid Executive Order is ultra vires and a violation of separation of powers.

## COUNT TWO
## VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT
### (All Plaintiffs v. Defendant Hegseth)

69.     Plaintiffs incorporate paragraphs 1 to 68 above by reference as if fully set forth herein.

70.     Under the Administrative Procedure Act ("APA"), a reviewing court "shall … hold unlawful and set aside agency action" that is "arbitrary and capricious" or "contrary to law." 5 U.S.C. § 706(2)(A).

71.     Section 4 of the Executive Order delegated to Defendant Hegseth the authority to suspend the application of the Executive Order to any subdivision of the Department of Defense if he certified that "the provisions of [Chapter 71] can be applied to such subdivision in a manner consistent with national security requirements and considerations."

72.     On April 23, 2025, Defendant Hegseth issued a certification that was published in the Federal Register and suspended the application of the executive order only for a tiny percentage of his Department's civilian employees:  "federal wage system employees in the trades at the following DOD component subdivisions . . . (a) Letterkenny Munition Center, US Army Aviation and Missile Command, United States Army; (b) Air Force Test Center, Air Force

Materiel Command, Department of the Air Force; (c) Air Force Sustainment Center, Air Force

Material Command, Department of the Air Force" (d) Fleet Readiness Center Southeast."  This

certification was final agency action reviewable under the Administrative Procedures Act.

73.    Defendant Hegseth's failure to exercise his delegated authority under Section 4 of

the Executive Order to suspend the Executive Order's exclusion of other Department

subdivisions or even explain that failure is arbitrary and capricious and contrary to law.

74.    Defendant Hegseth provided no reasoned explanation as to ***why*** the application of

Chapter 71 to the trades employees at a tiny number of Department subdivisions is "consistent

with national security requirements and considerations," whereas the application to Chapter 71 to

all other Department subdivisions is purportedly ***not*** "consistent with national security

requirements and considerations."

75.    Defendant Hegseth also provided no reasoned explanation as to why the

application of Chapter 71 to Department subdivisions represented by the Plaintiffs is purportedly

not "consistent with national security requirements and considerations" when DOD bargaining

units of police, security guards, and firefighters are permitted to maintain their collective

bargaining representation.

76.    Defendant Hegseth was required to provide an explanation of his decision

because Defendant Hegseth's determination that Chapter 71 cannot be applied to Plaintiffs'

bargaining units consistent with national security is a monumental change in the Department's

longstanding position on this issue. The Department's subdivisions have had collective

bargaining relationships with Plaintiffs' bargaining units for decades—through multiple wars—

without any adverse impact on national security. On information and belief, no prior Secretary of

Defense has sought to strip the workers in these bargaining units of their collective bargaining

rights. Indeed, even when expressly given the authority to exclude Department of Defense components from Chapter 71 during the first Trump Administration if necessary for national security reasons, the then-Secretary of Defense did not exercise that authority.

77.    There also is no relevant difference, for purposes of national security considerations, between the bargaining units Defendant Hegseth exempted and the bargaining units Defendant Hegseth did not exempt. Bargaining units represented by Plaintiffs perform the same type of work for other Department of Defense subdivisions with similar missions or missions less connected with national security work than the exempted subdivisions.

78.    Defendant Hegseth's action was also arbitrary and capricious and contrary to statute because any reasonable analysis would conclude that collective bargaining for Plaintiffs' bargaining units not only is consistent with national security but has greatly enhanced national security by attracting and maintaining a skilled civilian workforce. Indeed, Defendant Hegseth chose not to exempt from the executive order Department subdivisions that are not even arguably involved in performing national security work, such as the DoDEA bargaining unit of schoolteachers represented by Plaintiff AFT's Overseas Federation of Teachers. As such, there could not be any evidentiary support whatsoever in an administrative record for Defendant Hegseth's decision.

79.    Defendant Hegseth's failure to exercise his delegated authority under Section 4 of the Executive Order to suspend the Executive Order's exclusion of other Department subdivisions is also contrary to law because the Executive Order is ultra vires the President's narrow statutory authority and violates the separation of powers, the First Amendment's protection of speech and petitioning, the Fifth Amendment's guarantee of equal protection of the

laws, and the Fifth Amendment's guarantee of procedural and substantive due process as well as

its protection against unlawful government takings of property.

## COUNT THREE
## VIOLATION OF THE FIRST AMENDMENT
### (All Plaintiffs v. All Defendants)

80.    Plaintiffs incorporate paragraphs 1 to 79 above by reference as if fully set forth

herein.

81.    The First Amendment to the United States Constitution protects against

government actions "abridging the freedom of speech" and "the right of the people … to petition

the Government for a redress of grievances."

82.    The Executive Order was issued in retaliation for the protected speech and

petitioning activities by the American Federation of Labor and Congress of Industrial

Organizations and its affiliated unions that represent federal employees who have exercised their

First Amendment rights to oppose Trump administration policies by making public statements

and filing lawsuits. The Executive Order aims to chill the protected speech and petitioning

activity of all federal unions going forward. The White House's Fact Sheet baldly admitted this

motivation. That document justified the Executive Order on the basis of its assertions that

"Federal unions have declared war  on President Trump's agenda," that one such union

"describes itself as 'fighting back' against  Trump."

83.    The White House's Fact Sheet further makes clear that the Trump administration

will favor unions voicing support for Trump administration policies and/or refraining from

exercising their First Amendment rights to challenge those policies and punish unions that

express dissent from Trump administration policies and "fight[] back'" *id.*, against those policies

by petitioning the government for redress from the injuries those polices inflict. The Fact Sheet

declares: "President Trump supports constructive partnerships with unions who work with him" but "will not tolerate" what the White House characterizes as "mass obstruction." *Id.*

84.    This message that unions supporting Trump policies will receive favor and those opposing Trump policies will receive punishment is reinforced by the Executive Order's blanket exception preserving collective bargaining rights for federal agency police, firefighters, and security guards—whose unions have supported Republicans in general and President Trump in particular. The Fact Sheet highlights the special treatment: "Law Enforcement Unaffected. Police and firefighters will continue to collectively bargain."

85.    The Plaintiffs or their affiliated labor organizations have exercised their First Amendment rights to criticize the actions of the Trump Administration and to petition the government by filing lawsuits to challenge these policies. Such First Amendment activity is part of our constitutional system, not a threat to national security for purposes of 5 U.S.C. § 7103(b)(1) .

86.    The Executive Order's purpose and effect is to harm and punish unions by reason of their First-Amendment-protected speech and petitioning and to chill such protected activity going forward.

87.    The OPM Guidance, and Secretary Hegseth's Executive Order 14251 Certification all carry out and share in the Executive Order's retaliatory purpose and effects.

**COUNT FOUR**
**VIOLATION OF THE FIFTH AMENDMENT'S PROTECTIONS AGAINST THE GOVERNMENT'S ANNULMENT OF VESTED RIGHTS ARISING FROM THE GOVERNMENT'S OWN CONTRACTS**
**(All Plaintiffs v. All Defendants)**

88.    Plaintiffs incorporate paragraphs 1 to 87 above by reference as if fully set forth herein.

89.     The Fifth Amendment of the United States Constitution protects against deprivations of property "without due process of law" and provides that "private property" shall not be "taken for public use, without just compensation."

90.     Collective bargaining agreements entered into pursuant to Chapter 71 are contracts that bind federal agencies and unions representing their employees. *See* 5 U.S.C. §§ 7114(c)(3); 7116. Such "[v]alid contracts are property, whether the obligor be a private individual, a municipality, a state, or the United States." *Lynch v. United States*, 292 U.S. 571, 579 (1934). As such, contracts with the federal government are protected by the Takings Clause. *Id.*

91.     The Fifth Amendment's Due Process Clause also protects against the government's retroactive abrogation of its contracts. Where Congress has "the power to authorize" contracts, "the due process clause prohibits the United States from annulling them, unless, indeed, the action taken falls within the federal police power or some other paramount power." *Lynch*, 292 U.S. at 579. *See also Pension Ben. Guar. Corp. v. R.A. Gray & Co.*, 467 U.S. 717, 729 (1984).

92.     Plaintiffs or their local affiliates have CBAs with the federal government that are binding, bilateral contracts. These CBAs do not interfere in any way with national security.

93.     The Executive Order and the OPM Guidance seek to nullify CBAs and extinguish vested rights under them such as pending grievances over actions predating the Executive Order as well as any grievances that might be filed on or after March 27, 2025. These actions deprive Plaintiffs and their members of their vested rights under CBAs and thus their constitutionally protected property interests in CBAs. And they do so with no legitimate public purpose or

rational justification. The Executive Order and OPM Guidance therefore constitute unlawful

takings and violate the Fifth Amendment's guarantee of substantive due process.

**COUNT FIVE**
**VIOLATION OF THE FIFTH AMENDMENT'S GUARANTEE OF EQUAL**
**PROTECTION OF THE LAWS**
**(All Plaintiffs v. All Defendants)**

94.    Plaintiffs incorporate paragraphs 1 to 93 above by reference as if fully set forth

herein.

95.    The due process guarantee of the Fifth Amendment to the United States

Constitution includes a guarantee of equal protection. *See United States v. Windsor*, 570 U.S.

744, 769–70 (2013); *Bolling v. Sharpe*, 347 U.S. 497, 499 (1954).

96.    "The Constitution's guarantee of equality 'must at the very least mean that a bare

… desire to harm a politically unpopular group cannot' justify disparate treatment of that group."

*Windsor*, 570 U.S. at 770 (*quoting Dep't of Agriculture v. Moreno*, 413 U.S. 528, 534–35 (1973)).

97.    A "bare … desire to harm a politically unpopular group" is precisely what

motivated the Executive Order's exclusion of about 75 percent of union-represented employees

across multiple Cabinet departments and independent agencies, while providing a blanket

exception for agency police and firefighters, whose unions have supported President Trump. This

conclusion is all the more inescapable given the White House's statements admitting that the

purpose of the order is to harm and punish federal unions that have voiced opposition to Trump

administration policies and have petitioned the government for redress from those policies.

### COUNT SIX
### VIOLATION OF THE FIFTH AMENDMENT'S GUARANTEE
### OF PROCEDURAL DUE PROCESS
### (All Plaintiffs v. All Defendants)

98.     Plaintiffs incorporate paragraphs 1 to 97 above by reference as if fully set forth herein.

99.     The Fifth Amendment's protection against deprivations of property "without due process of law" requires, at a minimum, notice and an opportunity to be heard before the government may deprive a person of property.

100.     "Valid contracts are property, whether the obligor be a private individual, a municipality, a state, or the United States. Rights against the United States arising out of a contract with it are protected by the Fifth Amendment." *Lynch*, 292 U.S. at 579.

101.     The Executive Order and the OPM Guidance seek to retroactively nullify CBAs and extinguish pending grievances over actions predating the Executive Order as well as any grievances that might be filed on or after March 27, 2025. These actions deprive Plaintiffs and their members of their constitutionally protected property interests in CBAs lawfully entered into with government agencies and they do so without having afforded Plaintiffs any notice or opportunity to be heard in violation of the Fifth Amendment's guarantee of procedural due process. *See Ralls Corp. v. Comm. on Foreign Inv. in U.S.*, 758 F.3d 296, 318 (D.C. Cir. 2014).

### PRAYER FOR RELIEF

Wherefore, Plaintiffs pray for the following relief:

(a)     a declaratory judgment that:

i. the Executive Order, the OPM Guidance, and their nullification of Plaintiffs' statutory and contractual rights, are *ultra vires*, in violation of the separation of powers, in violation of the First Amendment's protection of speech and petitioning activities, in

violation of the Fifth Amendment's guarantee of equal protection of the laws, and in violation of

the Fifth Amendment's protection against unlawful takings and its guarantee of substantive due

process; and

        ii. Defendant Hegseth's failure to suspend application of the Executive Order

with respect to Plaintiffs' bargaining units or to explain that failure violates the Administrative

Procedure Act;

    (b)     preliminary and permanent injunctive relief that:

        i. prohibits the Defendants and their agents and successors from implementing or

otherwise giving effect to the Executive Order and the OPM Guidance with respect to Plaintiffs

and their members; or in the absence of such relief

        ii. sets aside Defendant Hegseth's April 23, 2025, Executive Order 14251

Certification insofar as it failed to suspend the Executive Order as to Plaintiffs' bargaining units

and directs Defendant Hegseth to address the question of whether suspending the Executive

Order as to Plaintiffs' bargaining units is warranted under 5 U.S.C. § 7103(b).

    (c)     an order granting Plaintiffs their attorney's fees and costs; and

    (d)     an order granting such other relief as this Court may deem just and proper.

Dated:  August 21, 2025            Respectfully submitted,

                      /s/ Scott A. Kronland
                      Scott A. Kronland*
                      Bronwen B. O'Herin*
                      Talia Stender**
                      Altshuler Berzon LLP
                      177 Post Street, Suite 300
                      San Francisco, CA 94108
                      (415) 421-7151
                      skronland@altber.com
                      boherin@altber.com
                      *Counsel for Plaintiffs*

/s/ Matthew Ginsburg
Matthew Ginsburg (#1001159)
Raven Hall (#1022296)
American Federation of Labor and Congress of
Industrial Organizations (AFL-CIO)
815 Black Lives Matter Plaza NW
Washington, DC 20006
(202) 637-5397
mginsburg@aflcio.org
rhall@aflcio.org
*Counsel for Plaintiff American Federation of Labor
and Congress of Industrial Organizations*

/s/ Michael A. Evans
Michael A. Evans***
Hartnett Reyes-Jones, LLC
4399 Laclede Avenue
St. Louis, Missouri 63108
(314) 531-1054
mevans@hrjlaw.com
*Counsel for Plaintiff Metal Trades Department,
AFL-CIO*

/s/ Gabriel Terrasa
Gabriel A. Terrasa*
Terrasa & Stair, P.A.
7472 Weather Worn Way
Columbia, Maryland 21046
(410) 609-3953
gterrasa@tslawmd.com
*Counsel for Plaintiff International Organization of
Masters, Mates, & Pilots, AFL-CIO*

/s/ Richard Hirn
Richard J. Hirn (#291849)
5335 Wisconsin Ave NW, Suite 440
Washington DC 20015
202-274-1812
richard@hirnlaw.com
*Counsel for Plaintiff District No. 1, PCD, Marine
Engineers Beneficial Association, AFL-CIO*

/s/ Keith R. Bolek
Keith R. Bolek (#463129)
April H. Pulliam (#198026)
O'Donoghue & O'Donoghue LLP

5301 Wisconsin Avenue, Suite 800
Washington, D.C. 20015
(202) 362-0041
kbolek@odonoghuelaw.com
apulliam@odonoghuelaw.com
*Counsel for Plaintiff Local 100, United Association of Journeymen and Apprentices of the Plumbing and Pipefitting Industry of the United States and Canada, AFL-CIO*

/s/ Jane Lauer Barker
Jane Lauer Barker**
Annalise Leonelli**
Pitta LLP
120 Broadway, 28th Floor
New York, NY  10271
(212) 652-3890
jbarker@pittalaw.com
aleonelli@pittalaw.com
*Counsel for Plaintiff Office and Professional Employees International Union, AFL-CIO*

/s/ Carla M. Siegel
Carla M. Siegel (#449953)
International Association of Machinists and Aerospace Workers, AFL-CIO
9000 Machinists Place
Upper Marlboro, MD 20772
(301) 967-4510
csiegel@iamaw.org
*Counsel for Plaintiff International Association of Machinists and Aerospace Workers, AFL-CIO*

/s/ Teresa Ellis
Teresa Ellis (#495855)
General Counsel
International Federation of Professional & Technical Engineers, AFL-CIO
513 C Street N.E.
Washington, D.C. 20002
Tel: (202) 239-4880
tellis@ifpte.org
*Counsel for Plaintiff International Federation of Professional & Technical Engineers, AFL-CIO*

*Admitted pro hac vice

34

** Pro hac vice motion to be filed
*** Pro hac vice motion pending