IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| AMERICAN FEDERATION OF LABOR AND CONGRESS OF INDUSTRIAL ORGANIZATIONS, *et al.*, <br><br>                     Plaintiffs, <br><br>      v. <br><br> DONALD J. TRUMP, *et al.*, <br><br>                     Defendants. | Civil Action No. 1:25-cv-02445-PLF |

**MEMORANDUM IN SUPPORT OF**
**PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES................................................................................................ iii

INTRODUCTION ...........................................................................................................1

BACKGROUND ............................................................................................................2

    A.    The Plaintiffs..................................................................................................2

    B.    The Executive Order .......................................................................................5

    C.    This Litigation...............................................................................................7

ARGUMENT .................................................................................................................8

    I.    This Court has jurisdiction over Plaintiffs' challenge to the Executive Order and to its implementation and enforcement. ...........................................................8

    II.    The preliminary injunction factors weigh in favor of a preliminary injunction. .....8

        A.    Plaintiffs are likely to succeed on the merits. ...............................................9

            1. The Executive Order is *ultra vires*.........................................................9

            2. The Executive Order violates the First Amendment............................12

            3. The Executive Order violates the Fifth Amendment. ...........................15

        B.    Unless preliminary relief is granted, Plaintiffs and their members will suffer serious and irreparable harm............................................................18

        C.    The equities and public interest favor preliminary relief...........................21

CONCLUSION.............................................................................................................22

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*Am. Foreign Serv. Ass'n v. Trump*,
No. CV 25-1030 (PLF), 2025 WL 1387331 (D.D.C. May 14, 2025)..........................1, 8, 9, 21

*Archdiocese of Washington v. Washington Metro. Area Transit Auth.*,
897 F.3d 314 (D.C. Cir. 2018) ...........................................................................................8

*Aref v. Lynch*,
833 F.3d 242 (D.C. Cir. 2016) .....................................................................................12, 13

*BE&K Constr. Co. v. NLRB*,
536 U.S. 516 (2002).............................................................................................................13

*Bolling v. Sharpe*,
347 U.S. 497 (1954).............................................................................................................18

*Cherokee Nation of Okl. v. Leavitt*,
543 U.S. 631 (2005).............................................................................................................16

*Cleveland Bd. of Ed. v. Loudermill*,
470 U.S. 532 (1985).............................................................................................................17

*Clinton v. City of New York*,
524 U.S. 417 (1998).............................................................................................................17

*Crockett v. D.C. Metro. Police Dep't*,
293 F.Supp.2d 63 (D.D.C. 2003) ........................................................................................16

*Elrod v. Burns*,
427 U.S. 347 (1976).............................................................................................................21

*Fed. Educ. Ass'n v. Trump*,
No. CV 25-1362 (PLF), 2025 WL 2355747 (D.D.C. Aug. 14, 2025) ........................... *passim*

*Franks Bros. Co. v. NLRB*,
321 U.S. 702 (1944).............................................................................................................20

*George Washington Univ. v. D.C.*,
318 F.3d 203 (D.C. Cir. 2003) ...........................................................................................16

*Heffernan v. City of Patterson*,
578 U.S. 266 (2016).............................................................................................................15

*Mississippi ex rel. Hood v. AU Optronics Corp.*,
571 U.S. 161 (2014).............................................................................................................9

*Int'l Union, United Gov't Sec. Officers of Am. v. Clark*,
   706 F. Supp. 2d 59 (D.D.C. 2010) ......................................................................16

*League of Women Voters v. Newby*,
   838 F.3d 1 (D.C. Cir. 2016) ...............................................................................20

*Lozman v. City of Riviera Beach*,
   585 U.S. 87 (2018) .......................................................................................12, 13

*Lynch v. United States*,
   292 U.S. 571 (1934) ...........................................................................................16

*McDonnell v. Cisneros*,
   84 F.3d 256 (7th Cir. 1996) ...............................................................................15

*Media Matters for Am. v. Bailey*,
   No. 24-CV-147 (APM), 2024 WL 3924573 (D.D.C. Aug. 23, 2024) *appeal
   dismissed sub nom. Media Matters for Am. v. Paxton*, No. 24-7141, 2025 WL
   492257 (D.C. Cir. Feb 13, 2025) ........................................................................14

*Nat'l Treasury Emps. Union v. Trump*,
   No. 25-5157, 2025 WL 1441563 (D.C. Cir. May 16, 2025) ..........................1, 2, 6

*Nat'l Treasury Emps. Union v. Trump*,
   No. CV 25-0935 (PLF), 2025 WL 1218044 (D.D.C. Apr. 28, 2025)............... *passim*

*Nken v. Holder*,
   556 U.S. 418 (2009).............................................................................................8

*Ralls Corp. v. Comm. on Foreign Inv. In U.S.*,
   758 F.3d 296 (D.C. Cir. 2014) ...........................................................................17

*Trump v. CASA, Inc.*,
   145 S. Ct. 2540 (2025)..........................................................................................1

*United States Dep't of Def. v. Am. Fed'n of Gov't Emps., AFL-CIO*,
   No. 6:25-CV-00119-ADA, 2025 WL 2058374 (W.D. Tex. July 23, 2025)...........22

*United States Dep't of Treasury v. Nat'l Treasury Emps. Union*,
   No. CV 2:25-049-DCR, 2025 WL 1446376 (E.D. Ky. May 20, 2025)..................22

*United States v. Windsor*,
   570 U.S. 744 (2013)............................................................................................18

*United States v. Winstar Corp.*,
   518 U.S. 839 (1996)............................................................................................16

*Welch v. Ciampa*,
   542 F.3d 927 (1st Cir. 2008) ................................................................................13

*Wilmer Cutler Pickering Hale & Dorr LLP v. Exec. Off. of the President*,
   774 F. Supp. 3d 86 (D.D.C. 2025) .......................................................................14

**Federal Statutes**

5 U.S.C. § 7103(b)(1) ........................................................................................7, 9, 12

**Executive Branch Materials**

Exec. Order No. 14251, 90 Fed. Reg. 14553 (Mar. 27, 2025) ............................... *passim*
   § 1(a) .......................................................................................................................5

**Constitutional Provisions**

First Amendment ................................................................................................. *passim*

Fifth Amendment ...............................................................................7, 15, 16, 18

## INTRODUCTION

Plaintiffs are labor organizations that represent bargaining units of federal employees pursuant to the Federal Service Labor-Management Relations Statute ("FSLMRS"). Many of these bargaining units have had union representation since the 1960s. On March 27, 2025, President Trump issued an executive order titled "Exclusions from Federal Labor-Management Relations Programs." Exec. Order No. 14251, 90 Fed. Reg. 14553 (Mar. 27, 2025) ("Executive Order"). The Executive Order removes collective bargaining rights from about three-fourths of the unionized federal workforce, including the bargaining unit workers at issue here. Plaintiffs seek a preliminary injunction to prevent the implementation of the Executive Order.

This Court has issued preliminary injunctions to enjoin implementation of the Executive Order in three related cases, concluding that the Executive Order will likely be struck down as *ultra vires*. *See Nat'l Treasury Emps. Union v. Trump* ("*NTEU I*"), No. CV 25-0935 (PLF), 2025 WL 1218044 (D.D.C. Apr. 28, 2025); *Am. Foreign Serv. Ass'n v. Trump* ("*AFSA*"), No. CV 25-1030 (PLF), 2025 WL 1387331 (D.D.C. May 14, 2025); *Fed. Educ. Ass'n v. Trump* ("*FEA*"), No. CV 25-1362 (PLF), 2025 WL 2355747 (D.D.C. Aug. 14, 2025). But those preliminary injunctions do not apply to the Plaintiffs' bargaining units. *See Trump v. CASA, Inc.*, 145 S. Ct. 2540 (2025) (holding that district courts generally cannot issue "universal" injunctions).

After the preliminary injunction in *NTEU I*, a D.C. Circuit panel stayed the injunction on the ground that the union's asserted harms were too speculative because the Office of Personnel Management ("OPM") had "directed agencies to refrain from terminating collective-bargaining agreements or decertifying bargaining units until after the litigation concludes." *Nat'l Treasury Emps. Union v. Trump* ("*NTEU II*"), No. 25-5157, 2025 WL 1441563, at *1 (D.C. Cir. May 16, 2025). At the beginning of August 2025, however, the government abandoned these "self-

imposed restrictions." *NTEU II*, 2025 WL 1441563, at *3. OPM updated its guidance on August 13, 2025 to notify federal agencies that they are free to unilaterally terminate their collective bargaining agreements. Ginsburg Decl. ¶27. Some of the Defendants have already sent out termination notices. *Id*. ¶¶24-26.

The Court should issue a preliminary injunction to prevent the Defendants from applying the Executive Order to Plaintiffs' bargaining units. For the reasons already stated in the Court's opinions in the three related cases, Plaintiffs are likely to succeed on their claims that the Executive Order is invalid. Moreover, it should now be beyond dispute that Plaintiffs and their bargaining unit workers will suffer serious and irreparable harm without preliminary relief. The workers will lose, among many other things, their right to union representation during the disciplinary process, to protections against reductions in force, and to contractual guarantees regarding work schedules, leaves, overtime hours, and other basic aspects of the employment relationship. *See infra* at 19-21. The Plaintiff unions will be unable to perform their core function of representing the workers. *Id*. at 20-21. The government would not suffer comparable harm from maintaining the pre-Executive Order status quo pending a final ruling on the Executive Order, which is likely to be invalidated.

## BACKGROUND

### A. The Plaintiffs

Other than Plaintiff American Federation of Labor and Congress of Industrial Organizations ("AFL-CIO") the Plaintiffs are labor unions that represent bargaining units of federal employees that are excluded from the FSLMRS by the Executive Order.

Plaintiff American Federation of Teachers, AFL-CIO ("AFT"), through its affiliate the Overseas Federation of Teachers, represents a bargaining unit of schoolteachers who are

employed by the Department of Defense Education Activity ("DoDEA"), a subdivision of the Department of Defense.  McNeil Decl. ¶¶3-4.  DoDEA operates public schools serving the children of military and civilian families stationed overseas.  *Id.* ¶5.  AFT's representation of this schoolteacher bargaining unit predates the adoption of the FSLRMS in 1978.  *Id.* ¶6.  A similar DoDEA bargaining unit is at issue in *FEA.  See* FEA, 2025 WL 2355747, at *2.

Plaintiff Metal Trades Department, AFL-CIO is a labor organization that, through its affiliated metal trades councils, serves as the bargaining representative for more than 20,000 blue-collar trades workers employed by various subdivisions of the Department of Defense.  Jones Decl. ¶¶2-12.  Metal trades councils also serve as the bargaining representatives of trades workers employed at facilities operated by the U.S. Coast Guard, which is now part of the Department of Homeland Security.  *Id.* ¶¶4, 11.  Some of these bargaining units of trades workers have had union representation since the 1960s.  *Id.* ¶13.

Plaintiff United Association of Journeymen and Apprentices of the Plumbing and Pipefitting Industry, Local 100 represents a bargaining unit of about 60 trades workers at an Army Depot in Texas.  Bradshaw Decl. ¶¶2-3.  Plaintiffs International Brotherhood of Electrical Workers ("IBEW"), Local Unions 26, 1688, 2080 and 2219 represent trades workers employed by subdivisions of the U.S. Army Corps of Engineers at locations around the country, such as at major dams on the main stem of the Missouri river, and at the Department of Defense Federal Facilities Division in Washington, D.C.  Sporin Decl. ¶¶4, 6; Muilenburg Decl. ¶¶4, 6; Cash Decl. ¶¶3, 5; Farver Decl. ¶¶4-6, 8.  Some of these trades workers have had union representation since at least as far back as the 1960s.  Muilenburg Decl. ¶5.

Plaintiff International Federation of Professional & Technical Engineers, AFL-CIO ("IFPTE"), through its IFPTE Local 20, represents a unit of professional employees of the

Environmental Protection Agency ("EPA") Region 9.  Biggs Decl. ¶¶2-3.  A different EPA bargaining unit is at issue in *NTEU.  See NTEU I,* 2025 WL 1218044 at *3.  IFPTE Local Unions also represent bargaining units of civilian employees of the U.S. Army Corps of Engineers and the Naval Sea Systems Command and a bargaining unit of professionals who work at an Army facility in New Jersey.  Biggs Decl. ¶3.  IFPTE Locals have represented some of these federal employee bargaining units for decades.  *Id.* ¶5.

Plaintiff International Organization of Masters, Mates & Pilots, AFL-CIO ("MM&P") serves as the bargaining representative for civilian mariners employed to provide transportation and supply services to various subdivisions of the Navy and the U.S. Army Corps of Engineers. Ciszewski Decl. ¶¶2-3, 5.  MM&P has represented its largest naval unit, composed of licensed deck officers sailing supply ships, since the early 1970s.  *Id.* ¶7.

Plaintiff District No. 1, Pacific Coast District, Marine Engineers' Beneficial Association, AFL-CIO ("MEBA") has represented licensed engineering and deck officers aboard U.S. government and merchant vehicles since at least 1973.  Vokac Decl. ¶¶1, 3.  MEBA also represents civilian licensed engineering officers employed by the U.S. Army Corps of Engineers, such as those aboard dredging vessels.  *Id.* ¶4.

Plaintiff Office and Professional Employees International Union, AFL-CIO ("OPEIU"), is a labor organization that, through its affiliate Local 2001, represents a bargaining unit of federal employees working at the Oak Ridge, Tennessee facility of the U.S. Department of Energy ("DOE").  Darcy Decl. ¶¶1-2.  The bargaining unit includes scientists, engineers, industrial hygienists, and accountants.  *Id.* ¶2.  OPEIU Local 2001 has represented this bargaining unit since 1981.  *Id.* ¶2.

Plaintiff International Association of Machinists and Aerospace Workers, AFL-CIO

("IAM") is a labor organization that, through its affiliate Locals 97, 174, 225, 282, 726, 1859,

1998, 2049, 2296, 2297, 2424, 2783, and 2902, represents federal civilian employees of various

subdivisions of the Department of Defense at facilities throughout the United States.  Norman

Decl. ¶2.  Additionally, IAM represents a unit of Coast Guard employees in Elizabeth City, North

Carolina, through its affiliate Local 2203.  *Id.*  Many of these bargaining units have had union

representation for decades.  *Id.*

Plaintiff AFL-CIO is the labor federation with which the other plaintiffs are affiliated.

Ginsburg Decl. ¶¶2-3.  The AFL-CIO's affiliated unions make per capita contributions to the

AFL-CIO based on the number of workers they represent.  *Id.* ¶29.

### B.  The Executive Order

This Court has already thoroughly surveyed the background to the issuance of the

Executive Order, the scope and effect of the Executive Order, and the White House Fact Sheet

and OPM Guidance that accompanied the Executive Order.  *See FEA*, 2025 WL 2355747, at *3-

4.  The same background applies here.

Although the Executive Order asserts that the FSLMRS "*cannot* be applied to [the

excluded] agencies and [] subdivisions in a manner consistent with national security

requirements and considerations," Exec. Order No. 14251, § 1(a) (emphasis supplied), many of

Plaintiffs' bargaining units had union representation for more than a decade *before* Congress

adopted the FSLMRS.  When "Congress found that 'labor organizations and collective

bargaining in the civil service are in the public interest,'" *FEA*, 2025 WL 2355747, at *2 (quoting

5 U.S.C. § 7101(a)(1)), Congress was acting against the backdrop of those collective bargaining

relationships.  Prior to adoption of the Executive Order, federal agencies never suggested that

collective bargaining for these units is inconsistent with national security.  Ginsburg Decl. ¶14;

Vokac Decl. ¶10; Ciszewski Decl. ¶8; Jones Decl. ¶14; Darcy Decl. ¶¶5-6.  Nor were Plaintiffs

consulted before the Executive Order was issued.  Ginsburg Decl. ¶14; Jones Decl. ¶14; Darcy

Decl. ¶11; McNeil Decl. ¶10.

      After this Court entered a preliminary injunction in *NTEU I*, the government successfully

obtained a stay pending appeal from the D.C. Circuit.  The government argued that the plaintiff

union's harm was too speculative because the government was not planning to terminate

collective bargaining agreements pending the outcome of litigation.  Brief for Government

seeking Emergency Motion for Stay at 27, *NTEU II* ("NTEU cannot establish any imminent loss

of bargaining power because agencies have been advised not to terminate collective bargaining

agreements at this time …."").  A divided D.C. Circuit panel agreed that because of the

government's "self-imposed restrictions," a stay was appropriate.  *NTEU II*, 2025 WL 1441563,

at *3 ("[T]he Union[] will not be harmed by a stay, largely for the same reasons that the Union

will not be harmed without a preliminary injunction.  The Union claims that a stay 'will nullify

the collective-bargaining rights of … NTEU-represented federal workers.' … But that ignores

the Government's self-imposed restrictions, so it misses the mark.").

      As this Court concluded in *FEA*, the government's self-imposed restrictions appear to

have been largely semantic because the government has been ignoring the requirements of

collective bargaining agreements, refusing to deal with unions, and refusing to process

grievances or participate in arbitration hearings.  *FEA*, 2025 WL 2355747, at *16-17; *id.* at *17

("The fact of the matter is that the collective bargaining agreements have been effectively

terminated.").  But now the government has abandoned its self-imposed restrictions.

At the beginning of August 2025, without any advance notice, federal agencies began to notify unions that their collective bargaining agreements were terminated because of the Executive Order.  Ginsburg Decl. ¶24, Ex. 8 (Department of Veterans Affairs announced that it was terminating its CBAs on August 8, 2025); *Id.* ¶25, Ex. 9 (EPA announced that was terminating its CBAs on August 8, 2025); *Id.* ¶26, Ex. 10 (U.S. Coast Guard announced that it was terminating its CBAs on August 8, 2025); Jones Decl. ¶20, Ex. 1 (same).  On August 14, 2025, OPM changed its written guidance, authorizing agencies to immediately "terminate, abrogate, or repudiate CBAs" without waiting for the outcome of litigation about the Executive Order.  Ginsburg Decl. ¶27, Ex. 11.

### C.  This Litigation

Plaintiffs filed this lawsuit on July 29, 2025.  Plaintiffs filed a first amended complaint on August 21, 2025, which added additional Plaintiffs and Defendants.  The first amended complaint asserts six counts: (1) the Executive Order is *ultra vires* because it exceeds the President's authority under 5 U.S.C. § 7103(b)(1); (2) the actions taken by the Department of Defense and Defendant Pete Hegseth related to the Executive Order are arbitrary and capricious and contrary to law in violation of the Administrative Procedure Act ("APA");[1] (3) the Executive Order reflects retaliation against Plaintiffs in violation of their First Amendment rights; (4) the Executive Order violates the Fifth Amendment's Takings Clause and prohibition against "the government's retroactive abrogation of its contracts"; (5) the Executive Order violates the equal protection guarantee included in the Fifth Amendment; and (6) the Executive Order violates the Plaintiffs' procedural due process rights.

---

[1] Plaintiffs do not seek preliminary relief with respect to their APA claims.

Plaintiffs seek a preliminary injunction to enjoin the Defendants, other than President Trump, from implementing the Executive Order and the OPM Guidance against the Plaintiffs' bargaining units and bargaining unit workers.  Plaintiffs have submitted a proposed order that tracks the Order granting a preliminary injunction in *FEA* and that identifies Plaintiffs' bargaining units at issue here.

## ARGUMENT

### I. This Court has jurisdiction over Plaintiffs' challenge to the Executive Order and to its implementation and enforcement.

The Government argued in *NTEU I*, *AFSA*, and *FEA* that Congress divested the district courts of jurisdiction to hear challenges to the Executive Order by creating an administrative review system in the FSLMRS, even though the Executive Order excludes the agencies and subdivisions at issue from the FSLMRS and, therefore, from the administrative review system. The Court has thoroughly considered and rejected this jurisdictional argument, and the same reasoning applies here.  *See NTEU I*, 2025 WL 1218044, at \*4-6; *AFSA*, 2025 WL 1387331, at \*4-7; *FEA*, 2025 WL 2355747, at \*5-6.

### II. The preliminary injunction factors weigh in favor of a preliminary injunction.

To secure a preliminary injunction, Plaintiffs must establish that "four factors, taken together, warrant relief: likely success on the merits, likely irreparable harm in the absence of preliminary relief, a balance of the equities in its favor, and accord with the public interest." *Archdiocese of Washington v. Washington Metro. Area Transit Auth*., 897 F.3d 314, 321 (D.C. Cir. 2018) (citation and quotation marks omitted).  The last two factors "merge when the Government is the opposing party."  *Nken v. Holder*, 556 U.S. 418, 435 (2009).  Plaintiffs have made that showing here.

A.      **Plaintiffs are likely to succeed on the merits.**

1. **The Executive Order is *ultra vires*.**

**a.**  Plaintiffs are likely to succeed on their claim that the Executive Order is *ultra vires*. The Court has already concluded that the Executive Order is not entitled to a presumption of regularity.  *FEA*, 2025 WL 2355747, at *9-11; *NTEU I*, 2025 WL 1218044, at *9-12; *AFSA*, 2025 WL 1387331, at *9-10.  The Court has also concluded that, in assessing whether the Executive Order is *ultra vires*, the proper inquiry is whether the Executive Order's exclusions – taken together as a whole – show that the Executive Order exceeded the President's authority. *FEA*, 2025 WL 2355747, at *11-15.  Finally, this Court concluded in *FEA* that the Executive Order "patently" exceeds the President's authority and must be invalidated "as a whole."  *Id.* This Court's order in *FEA* was limited to the parties to that case.  But the Court's reasoning applies equally here.

**b.**  While the Court need not reach this issue, the Executive Order is *ultra vires* for a second reason: The Executive Order violates the statutory requirements for *how* the President's authority may be exercised.

Section 7103(b)(1) authorizes the President to exclude an "agency" or "subdivision" from the FSLMRS if the President determines that 1) "the agency or subdivision has as a primary function intelligence, counterintelligence, investigative, or national security work" and 2) the FSLMRS "cannot be applied to that agency or subdivision in a manner consistent with national security requirements and considerations."  5 U.S.C. § 7103(b)(1).  Section 7103 does not give the President authority to exclude employees according to occupation, union affiliation, or any other category or grouping.  *See Mississippi ex rel. Hood v. AU Optronics Corp.*, 571 U.S. 161, 169 (2014) ("Had Congress intended the latter, it easily could have drafted language to that

effect.").  Nor does the statute authorize the President to make the required determinations for exclusion at the *agency* level (rather than subdivision by subdivision) if the entire agency is not excluded.

The Executive Order contains a very long list of agencies and subdivisions that are excluded from the FSLMRS.  Yet the Executive Order also provides, on a government-wide basis, that it does not exempt from the FSLMRS "the immediate, local employing offices of police officers, security guards, or firefighters" that are within those excluded agencies or subdivisions.  For example, both Plaintiff Metal Trades Department and Plaintiff IFPTE represent employees of the Portsmouth Naval Shipyard that are excluded by the Executive Order, whereas the International Association of Firefighters ("IAFF") has a bargaining unit at the Portsmouth Naval Shipyard that is *not* excluded.  Jones Decl. ¶19.  The Executive Order contains a determination that the FSLMRS cannot be applied to the Department of Defense, but there are at least 67 police and fire fighter bargaining units within the Department of Defense that are exempted from the Executive Order.  Kronland Decl. ¶3.

OPM's guidance documents make clear that the Executive Order's exclusion of employees is according to occupation, rather than by agency or subdivision.  The Chief Human Capital Officer Council ("CHCOC"), an OPM interagency forum, issued an April 22 2025 FAQ Document stating that "For grievances that include positions not subject to exclusion from collective bargaining (e.g., police officers, security guards, firefighters), agencies should conduct their negotiated grievance procedures as they normally would."  Ginsburg Decl. ¶8, Ex. 5 at 5. The CHCOC April 8, 2025 FAQs Document likewise emphasizes that agencies should honor FSLRMS rights for certain occupations while excluding other occupations within the same subdivision or even the same collective bargaining agreement.  *Id.* ¶7, Ex. 4 at 3 ("Agencies

should … disapprove any agreement currently undergoing review for units that are no longer recognized within a covered agency or subdivision…. For agreements that include positions not subject to exclusion from collective bargaining (e.g., police officers, security guards, firefighters), agencies should conduct AHR as they normally would.  Lastly, for agreements that include a mix of excluded and included units, agencies should continue AHR and include a note that the agreement only covers those not excluded by Executive Order 14251 and that the agreement has no applicability to other employees.").  Various other questions in the FAQs Documents make clear that, under the Executive Order, employees within the same agency are included or excluded from the FSLMRS according to occupation.  *Id.* ¶7, Ex. 4 at 2 ("Q[.] What actions should agencies take regarding bargaining units that represent both (i) employees in positions *not* subject to exclusion (e.g., police officers, security guards, firefighters) and (ii) agency employees now *excluded* under the President's new directive?  A[.] Agencies should preserve the rights of employees not excluded from collective bargaining ….  For employees no longer included in a bargaining unit, agencies should follow the direction provided in this guidance."); *Id.* ¶8, Ex. 5 at 5 ("Q[.] May agencies communicate with unions representing employees who are still recognized under Executive Order 14251 (e.g., police officers, security guards, firefighters) …?  …  A[.] Yes. Unions who have bargaining unit employees that are not excluded under the Executive Order, maintain recognition under Chapter 71 ….").

Consistent with OPM's guidance, the Department of Veterans Affairs recently announced that it would terminate its collective bargaining agreements pursuant to the Executive Order, but that "[c]ontracts covering the roughly 4,000 VA police officers, firefighters or security guards . . . will remain in place, as those occupations are exempt from the EO."  Ginsburg Decl. ¶24, Ex. 8 at 2-3.

The Executive Order delegated authority to the Secretaries of Veterans Affairs and Defense to suspend the application of the Executive Order to subdivisions of their agencies. The Secretary of Veterans Affairs suspended the application of Executive Order only to employees represented by particular unions. Ginsburg Decl. ¶10. The Secretary of Defense issued an order that suspended the application of the Executive Order to "federal wage system employees in the trades"—rather than all types of employees—at a few "DOD component subdivisions." Ginsburg Decl. ¶11.

In sum, Section 7103(b)(1), by its plain language, requires action by "agency" or "subdivision." The Executive Order is also *ultra vires* because it violates this requirement.

## 2. The Executive Order violates the First Amendment.

Plaintiffs are also likely to succeed on their First Amendment claim. "[T]he First Amendment prohibits government officials from retaliating against individuals for engaging in protected speech." *Lozman v. City of Riviera Beach*, 585 U.S. 87, 90 (2018) (citation omitted). To prevail on a First Amendment retaliation claim, courts traditionally require plaintiffs to show that "(1) [they] engaged in conduct protected under the First Amendment; (2) the defendant took some retaliatory action sufficient to deter a person of ordinary firmness in plaintiff's position from speaking again; and (3) a causal link between the exercise of a constitutional right and the adverse action taken against [them]." *Aref v. Lynch*, 833 F.3d 242, 258 (D.C. Cir. 2016) (citation omitted). Plaintiffs can satisfy each of these elements.

As to the first element, Plaintiffs have affirmatively spoken out against actions taken by President Trump and have filed lawsuits to challenge his administration's actions. *See, e.g.*, Ginsburg Decl. ¶15 ("The AFL-CIO's website … is filled with media releases that condemn the actions of the Executive Branch to fire federal employees and close federal agencies."); McNeil

Decl. ¶26 ("The AFT's opposition to the Administration's agenda is a matter of public record and is recorded in the press releases issued between Inauguration Day and late March, immediately prior to the release of the EO."). Plaintiffs have also filed lawsuits challenging the President's policies. *See, e.g.*, Ginsburg Decl. ¶16; McNeil Decl. ¶27. This is speech and petitioning activity that occupies the highest level of First Amendment protection. *See Lozman,* 585 U.S. at 101; *BE&K Constr. Co. v. NLRB*, 536 U.S. 516, 524 (2002). Declining to support the President's political goals is also protected First Amendment activity. *See Welch v. Ciampa*, 542 F.3d 927, 939 (1st Cir. 2008) (finding "no principled basis for holding that an employee who supports an opposition group is protected by the First Amendment but one who chooses to remain neutral is vulnerable to retaliation."). The Executive Order strips collective bargaining protections from Plaintiffs' bargaining units, while preserving collective bargaining for law enforcement unions. Ginsburg Decl. ¶¶17-19; Jones Decl. ¶19. The country's largest law enforcement union has provided political support for the President. Ginsburg Decl. ¶19.

Second, the elimination of collective bargaining rights that Plaintiffs and their members have enjoyed for many decades would chill First Amendment activity by deterring a person of ordinary firmness from speaking again. *See Aref*, 833 F.3d at 258. The harm flowing from the Executive Order has been swift and substantial: agencies stopped dues collection, ignored grievances, and are now repudiating their collective bargaining agreements entirely. Jones Decl. ¶¶18, 20; McNeil Decl. ¶¶16-18, 23; Ginsburg Decl. ¶¶20-27; Biggs Decl. ¶¶10-13; Norman Decl. ¶¶5-6; Ciszewski Decl. ¶11.

Third, the causal relationship between Plaintiffs' exercise of First Amendment rights and the Executive Order is apparent from statements in the White House Fact Sheet that accompanied the Executive Order. "For example, the Fact Sheet states that '[c]ertain Federal

unions have declared war on President Trump's agenda,' by, *inter alia*, filing grievances against President Trump and by stating that they would '"fight[ ] back" against Trump.' [Citation omitted.] The Fact Sheet further states that the Civil Service Reform Act of 1978 – of which the FSLMRS is a part – 'enables hostile Federal unions to obstruct agency management,' and that the President 'refuses to let union obstruction interfere with his efforts to protect Americans and our national interests. [Citation omitted.]'" *NTEU I*, 2025 WL 1218044, at *10. These statements evidence "retaliatory motive towards certain unions" and "reflect President Trump's frustration with the unions' representational activity and exercise of their First Amendment rights." *Id.* Indeed, "the Fact Sheet's statement that President Trump 'supports constructive partnerships with unions who work with him'" *id.*, shows that the President's frustration with the unions' First Amendment activity motivated his decision to strip them of their collective bargaining rights. *See Media Matters for Am. v. Bailey*, No. 24-CV-147 (APM), 2024 WL 3924573, at *14 (D.D.C. Aug. 23, 2024) *appeal dismissed sub nom. Media Matters for Am. v. Paxton*, No. 24-7141, 2025 WL 492257 (D.C. Cir. Feb 13, 2025) (the government's "public statements are direct evidence of retaliatory intent"); *Wilmer Cutler Pickering Hale & Dorr LLP v. Exec. Off. of the President*, 774 F. Supp. 3d 86, 88 (D.D.C. 2025) (relying on White House statements in the "Fact sheet published the same day" in finding executive order was retaliatory.").

The Fact Sheet also emphasizes that: "***Law Enforcement Unaffected.*** Police and firefighters will continue to collectively bargain." Ginsburg Decl. ¶5, Ex. 2 at 2. Because the Executive Order is so wildly overbroad that it covers agencies and subdivisions that do not even arguably have a "primary" national security purpose, while not covering law enforcement bargaining units represented by unions that have been political supporters of the President (when

those bargaining units would be more closely connected to national security considerations than a bargaining unit of schoolteachers or trades workers), Plaintiffs are likely to prevail on their claim that the Executive Order is unlawful First Amendment retaliation.

The government will likely argue that there is not a perfect fit between the Executive Order's classifications and which unions endorsed or opposed the President or his policies. For purposes of a First Amendment retaliation claim, there need not be a perfect fit. It is "the government's reason" for the retaliatory action that counts. *See Heffernan v. City of Patterson*, 578 U.S. 266, 273 (2016) (sustaining a First Amendment retaliation claim by an employee whose employer mistakenly believed he had engaged in protected activity). Courts have recognized, for example, that an employer may "retaliate against a group of workers that he knows includes the complainant." *McDonnell v. Cisneros*, 84 F.3d 256, 262 (7th Cir. 1996). Such collective punishment constitutes "genuine retaliation." *Id.*

The government also will likely argue that even if part of the motivation for the Executive Order was retaliation for First Amendment-protected activity, the President would have taken the same action anyway. But the Court's analysis of why the Executive Order is *ultra vires* shows why that argument will be unsuccessful. The Executive Order excludes agencies and subdivisions that do not even arguably have a "primary" purpose of performing national security work. And the Executive Order excludes bargaining units that have had continuous union representation for more than 50 years without any interference with national security considerations. A retaliatory motive is the only motive that explains the Executive Order.

### 3. The Executive Order violates the Fifth Amendment.

Plaintiffs are also likely to prevail on their Fifth Amendment claims.

**a.**  The Fifth Amendment provides that "[n]o person shall be ... deprived of … property, without due process of law."  U.S. Const. amend. V.  The Executive Order deprives Plaintiffs of their property interests in their collective bargaining agreements with the federal government. The Supreme Court has long recognized that "[v]alid contracts are property, whether the obligor be a private individual, a municipality, a state, or the United States."  *Lynch v. United States*, 292 U.S. 571, 579 (1934); *see also Cherokee Nation of Okl. v. Leavitt*, 543 U.S. 631, 646 (2005); *United States v. Winstar Corp.*, 518 U.S. 839, 875-76 (1996).  CBAs are contracts that give rise to property interests protected by the Fifth Amendment.  *Int'l Union, United Gov't Sec. Officers of Am. v. Clark*, 706 F. Supp. 2d 59, 67-68 (D.D.C. 2010).  As a result of the Executive Order, the Defendants are abrogating their collective bargaining agreements.  *See supra* at 6-7.

The wholesale abrogation of these collective bargaining agreements violates substantive due process because it involves egregious government misconduct.  *See George Washington Univ. v. D.C.*, 318 F.3d 203, 209 (D.C. Cir. 2003) (a claim for a substantive due process violation requires "egregious government misconduct" resulting from a deprivation of constitutionally protected "property interest[s]").  To satisfy the egregious misconduct test, a plaintiff may show "'grave unfairness' by [government] officials" either though "a substantial infringement of the law prompted by personal or group animus, or [ ] a deliberate flouting of the law that trammels significant personal or property rights."  *Crockett v. D.C. Metro. Police Dep't*, 293 F.Supp.2d 63, 69 (D.D.C. 2003) (quoting *Tri Cty. Indus., Inc. v. District of Columbia*, 104 F.3d 455, 459 (D.C. Cir. 1997)).  Here, the President deliberately disregarded the requirements of Congress's carefully crafted statutory scheme.  He relied on a narrow "national security" exception to upend the FSLMRS, stripping collective bargaining rights from two-thirds of the federal workforce, which amounts to a constitutionally impermissible amendment or repeal of a statute.  *See supra*

16

at 9; *NTEU I*, 2025 WL 1218044, at *7-16; *FEA*, 2025 WL 2355747, at *7-15; *Clinton v. City of New York*, 524 U.S. 417, 438 (1998).  The record suggests that this infringement of the Constitution's separation of powers was prompted by animus.  *See supra* at 13-14; *NTEU I*, 2025 WL 1218044, at *10-11 (noting "clear evidence" of "retaliatory motive to punish unions" that "have declared war on President Trump's agenda"); *id.* at *10 (contemporaneous public "statements reflect President Trump's frustration with the unions' representational activity and exercise of their First Amendment rights"); *see also FEA*, 2025 WL 2355747, at *9-10.

The government may argue that there is no due process violation because Plaintiffs signed their CBAs against the backdrop of the FSLMRS, which grants the President the authority to exclude agencies or subdivisions.  Such an argument would be without merit.  As discussed above, the Executive Order is *ultra vires*.  *See supra* at 9-12.

**b.**  Plaintiffs are also likely to succeed in their procedural due process claim.  *See Ralls Corp. v. Comm. on Foreign Inv. In U.S.*, 758 F.3d 296, 316 (D.C. Cir. 2014); *Cleveland Bd. of Ed. v. Loudermill*, 470 U.S. 532, 532 (1985).  Even in cases where true national security concerns are implicated, procedural due process generally "requires, at the least, that an affected party be informed of the official action, be given access to the unclassified evidence on which the official actor relied[,] and be afforded an opportunity to rebut that evidence."  *Ralls*, 758 F.3d at 319.

Plaintiffs did not receive notice or the opportunity to be heard before issuance of the Executive Order, even though the Executive Order would wipe out their property interests in their collective bargaining agreements.  Biggs Decl. ¶12; Ciszewski Decl. ¶¶10-11; McNeil ¶¶10-11; Ginsburg Decl. ¶14.  Moreover, although the Executive Order delegated authority to the Secretary of Defense to make exceptions (and thereby preserve Plaintiffs' property interests), the

Secretary of Defense did not provide Plaintiffs that represent Defense Department units with any type of process before issuing his order regarding the exceptions. McNeil Decl. ¶¶11-15.

 **c.** The Fifth Amendment also includes an equal protection component. *See United States v. Windsor*, 570 U.S. 744, 769-70 (2013); *Bolling v. Sharpe*, 347 U.S. 497, 499 (1954). Plaintiffs are likely to succeed on their claim that the abrogation of their property interests in their collective bargaining agreements violated equal protection. "The Constitution's guarantee of equality 'must at the very least mean that a bare … desire to harm a politically unpopular group cannot' justify disparate treatment of that group." *Windsor*, 570 U.S. at 770 (citation omitted). The Executive Order's exclusion of two-thirds of the federal workforce from the FSLMRS is not supported by a legitimate government interest. The Executive Order's express preservation of collective bargaining rights for favored unions, while stripping disfavored unions of those same rights, coupled with contemporaneous statements describing disfavored unions as "hostile," at "war" with the administration, and "obstruct[ing] to agency management," reveal a desire to punish and harm disfavored unions. Ginsburg Decl. ¶5, Ex. 2 at 3-4.

 **B. Unless preliminary relief is granted, Plaintiffs and their members will suffer serious and irreparable harm.**

 Plaintiffs and their members will suffer irreparable harm from the implementation of the Executive Order for the same reasons explained by this Court in *FEA*, 2025 WL 2355747, at *15-19.

 After issuance of the Executive Order, agencies stopped making voluntary payroll deductions of union membership dues, thereby causing an immediate drop in Plaintiffs' income and threatening their ability to continue to represent their bargaining units. Ginsburg Decl. ¶21-22; Biggs Decl. ¶10; Norman Decl. ¶5; Ciszewski Decl. ¶11; Jones Decl. ¶18; McNeil Decl. ¶16; Vokac Decl. ¶6; Sporin Decl. ¶¶12-13.

Additionally, although agencies did not terminate their collective bargaining agreements, they stopped processing grievances and participating in arbitrations. McNeil Decl. ¶¶18-19; Ginsburg Decl. ¶22; Biggs Decl. ¶10; Norman Decl. ¶6; Ciszewski Decl. ¶11; Vokac Decl. ¶7. The agencies also stopped giving union representatives official time to conduct representation activities. McNeil Decl. ¶17. The agencies also refused to meet with union representatives. Vokac Decl. ¶9; Sporin Decl. ¶12.

But now the agencies are going even further to inflict irreparable harm. In August of 2025, the agencies began formally repudiating their collective bargaining agreements. *See supra* at 7. As a result, employees will lose their right to union representation during the disciplinary process, Biggs Decl. ¶14, Norman Decl. ¶9, Ciszewski Decl. ¶12, Darcy Decl. ¶¶9, 10b, Sporin Decl. ¶14; they will lose protections against reduction-in-force actions, Biggs Decl. ¶14, Norman Decl. ¶4c, Jones Decl. ¶17c, McNeil Decl. ¶¶20-23, Darcy Decl. ¶¶9, 10g, Sporin Decl. ¶14; they will lose enforcement mechanisms for statutory protections, Biggs Decl. ¶¶15-16, Jones Decl. ¶17d; they will lose bargained-for work schedules, leaves, and health and safety standards, Norman Decl. ¶9, Biggs Decl. ¶17, Ciszewski Decl. ¶12, Jones Decl. ¶17a-b, Darcy Decl. ¶¶9, 10a, 10f, Sporin Decl. ¶¶9a-b, 14. The Plaintiff unions will lose their right to meet and negotiate with the agencies about the terms and conditions of employment. Biggs Decl. ¶17; Ciszewski Decl. ¶12; Darcy Decl. ¶9, 10c. OPM's guidance directs agencies to, upon termination of the applicable collective bargaining agreement, "cease participating in grievance procedures," terminate pending grievance proceedings, and reassign employees performing representational duties pursuant to official-time arrangements in CBAs. Ginsburg Decl. ¶38, Ex. 3 at 5-6. All these harms will occur in the absence of preliminary relief.

19

"Courts have long recognized that 'the unlawful refusal of an employer to bargain collectively with its employees' chosen representatives disrupts the employees' morale, deters their organizational activities, and discourages their membership in unions.' *Franks Bros. Co. v. NLRB*, 321 U.S. 702, 704 (1944)." *FEA*, 2025 WL 2355747, at *16-17 (quoting *NTEU I*, 2025 WL 1218044, at *17). "The termination of collective bargaining agreements and exclusion from the protections of FSLRMS will leave federal workers with no contractual rights and no union representation. It will also cause a loss of membership for the unions because many workers will not remain members of unions that cannot effectively serve as their representatives." Ginsburg Decl. ¶29. *See also FEA*, at *17 ("'the loss of [ ] statutory protections' resulting from the Executive Order strikes at the 'heart' of the Union Plaintiffs' primary 'purpose and mission,' thereby 'pos[ing] an existential threat to the union[s].'") (citation omitted); *League of Women Voters v. Newby*, 838 F.3d 1, 9 (D.C. Cir. 2016) ("[O]bstacles [that] unquestionably make it more difficult for the [plaintiff] to accomplish [its] primary mission ... provide injury for purposes both of standing and irreparable harm.").

These harms cannot be remedied after the fact because they are not just monetary harms. For example, IFPTE represents a bargaining unit of EPA scientists. Some of those scientists have been placed on administrative leave because they wrote a letter to EPA Administrator Lee Zeldin identifying concerns about the EPA disregarding peer-reviewed research and dismantling the Office of Research and Development. Biggs Decl. ¶11. As a result of the Executive Order, these scientists have lost the protections of union representation and of the collective bargaining agreement. Biggs Decl. ¶14. Other workers are now afraid to voice their concerns, fearing that they will be disciplined, that they will be denied union support, and that they no longer have rights or a process or forum to enforce their rights. Biggs Decl. ¶¶15-16.

20

On August 20, 2025, EPA's "Office of Mission Support" issued "FAQs" about the "EPA Collective Bargaining Agreement Termination."  Biggs Decl. ¶18, Ex. 3.  EPA threatened employees that they could face *criminal* conflict of interest charges for performing "union activities on *non-duty* time."  *Id.* at 7-8 (emphases supplied).  EPA stated that bargaining unit employees cannot "carry out union activities," even "in a personal capacity," without "prior approval from an EPA ethics official."  *Id.* at 7.  EPA further stated that employees "who are in an investigatory interview and reasonably believe they may be subject to discipline have no entitlement to a union representative" (*id.* at 4); that union representatives may not use agency office space or equipment (*id.* at 3); that any negotiations with unions "should be discontinued immediately" (*id.*); that "[a]ll grievances previously filed under a negotiated grievance procedure will be considered dismissed" (*id.* at 6); that no "new grievances under the CBA will be accepted" (*id.*); that arbitration decisions for prior grievances "will be treated as non-binding" (*id.*); that bargaining unit employees should be coded as "ineligible to join a union" (*id.* at 4); and that union representatives will no longer have a right to serve on safety committees (*id.* at 6).

Absent preliminary relief, these actions will cause harm that cannot be remedied later.  *See FEA*, 2025 WL 2355747, at *17 (deprivation to employees is irreparable; "a favorable ruling cannot, for example, 'retroactively help the member who has gone into a disciplinary meeting without the counsel of their union'") (citation omitted); *cf. Elrod v. Burns*, 427 U.S. 347, 350, 373-74 (1976) ("The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.")

### C.  The equities and public interest favor preliminary relief.

Finally, as the Court explained in *NTEU I*, *AFSA*, and *FEA*, the balance of the equities and assessment of the public interest weigh in Plaintiffs' favor.  *NTEU I*, 2025 WL 1218044, at

*20-21; *AFSA*, 2025 WL 1387331, at *15; *FEA*, 2025 WL 2355747, at *18-19.  Plaintiffs have represented bargaining units of federal workers for more than 50 years—across multiple presidential administrations and during wartime and peacetime.  *See* Biggs Decl. ¶5; Ciszewski Decl. ¶¶7-8; Jones Decl. ¶13, McNeil Decl. ¶6; Vokac Decl. ¶10; Sporin Decl. ¶5.  "Granting the preliminary injunction would merely require the government to function as it has for over half a century; the lack of a preliminary injunction, by contrast, would cause immense and irreparable harm to the Union Plaintiffs."  *FEA*, 2025 WL 2355747, at *19.

The government may argue, as it did in *FEA*, that it has already taken some actions to implement the Executive Order and that reversing course would require the expenditure of resources.  *See FEA*, 2025 WL 2355747, at *18.  As the Court recognized in *FEA*, "the government 'cannot suffer harm from an injunction that merely ends an unlawful practice ....'" *Id.* (citation omitted).  Moreover, the government knew that the Executive Order is legally dubious, which is why the government, on the day the Executive Order was issued, filed two affirmative lawsuits requesting declaratory judgments that the Executive Order is valid.[2]  The government also has been on notice since April 2025, when this Court issued its *NTEU I* preliminary injunction, that the Executive Order will likely be invalidated.  Any harm to the government from having to go back to the pre-Executive Order status quo is self-inflicted harm.

## CONCLUSION

For the foregoing reasons, this Court should grant Plaintiffs' motion for a preliminary injunction.

---

[2] *United States Dep't of Def. v. Am. Fed'n of Gov't Emps., AFL-CIO*, No. 6:25-CV-00119-ADA, 2025 WL 2058374 (W.D. Tex. July 23, 2025) (dismissing lawsuit for lack of jurisdiction); *United States Dep't of Treasury v. Nat'l Treasury Emps. Union*, No. CV 2:25-049-DCR, 2025 WL 1446376 (E.D. Ky. May 20, 2025) (same).

Dated:  August 22, 2025                         Respectfully submitted,

/s/ Scott A. Kronland
Scott A. Kronland*
Bronwen B. O'Herin*
Talia Stender**
Altshuler Berzon LLP
177 Post Street, Suite 300
San Francisco, CA 94108
(415) 421-7151
skronland@altber.com
boherin@altber.com
tstender@altber.com
*Counsel for Plaintiffs*

/s/ Matthew Ginsburg
Matthew Ginsburg (#1001159)
Raven Hall (#1022296)
American Federation of Labor and Congress of
Industrial Organizations (AFL-CIO)
815 Black Lives Matter Plaza NW
Washington, DC 20006
(202) 637-5397
mginsburg@aflcio.org
rhall@aflcio.org
*Counsel for Plaintiff American Federation of Labor
and Congress of Industrial Organizations*

/s/ Michael A. Evans
Michael A. Evans***
Hartnett Reyes-Jones, LLC
4399 Laclede Avenue
St. Louis, Missouri 63108
(314) 531-1054
mevans@hrjlaw.com
*Counsel for Plaintiff Metal Trades Department,
AFL-CIO*

/s/ Gabriel Terrasa
Gabriel A. Terrasa*
Terrasa & Stair, P.A.
7472 Weather Worn Way
Columbia, Maryland 21046
(410) 609-3953
gterrasa@tslawmd.com

*Counsel for Plaintiff International Organization of Masters, Mates, & Pilots, AFL-CIO*

/s/ Richard Hirn
Richard J. Hirn (#291849)
5335 Wisconsin Ave NW, Suite 440
Washington DC 20015
202-274-1812
richard@hirnlaw.com
*Counsel for Plaintiff District No. 1, PCD, Marine Engineers Beneficial Association, AFL-CIO*

/s/ Keith R. Bolek
Keith R. Bolek (#463129)
April H. Pulliam (#198026)
O'Donoghue & O'Donoghue LLP
5301 Wisconsin Avenue, Suite 800
Washington, D.C. 20015
(202) 362-0041
kbolek@odonoghuelaw.com
apulliam@odonoghuelaw.com
*Counsel for Plaintiff Local 100, United Association of Journeymen and Apprentices of the Plumbing and Pipefitting Industry of the United States and Canada, AFL-CIO*

/s/ Jane Lauer Barker
Jane Lauer Barker**
Annalise Leonelli**
Pitta LLP
120 Broadway, 28th Floor
New York, NY 10271
(212) 652-3890
jbarker@pittalaw.com
aleonelli@pittalaw.com
*Counsel for Plaintiff Office and Professional Employees International Union, AFL-CIO*

/s/ Carla M. Siegel
Carla M. Siegel (#449953)
International Association of Machinists and Aerospace Workers, AFL-CIO
9000 Machinists Place
Upper Marlboro, MD 20772
(301) 967-4510
csiegel@iamaw.org

24

*Counsel for Plaintiff International Association of Machinists and Aerospace Workers, AFL-CIO*

/s/ Teresa Ellis
Teresa Ellis (#495855)
General Counsel
International Federation of Professional &
Technical Engineers, AFL-CIO
513 C Street N.E.
Washington, D.C. 20002
Tel: (202) 239-4880
tellis@ifpte.org
*Counsel for Plaintiff International Federation of Professional & Technical Engineers, AFL-CIO*

*Admitted pro hac vice
** Pro hac vice motion to be filed
*** Pro hac vice motion pending