IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| AMERICAN FEDERATION OF LABOR AND CONGRESS OF INDUSTRIAL ORGANIZATIONS, *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> DONALD J. TRUMP, *et al.*, <br><br> Defendants. | Civil Action No. 1:25-cv-02445-PLF |

## DECLARATION OF MATTHEW J. GINSBURG

Matthew J. Ginsburg hereby declares:

1. I am the General Counsel of the American Federation of Labor and Congress of Industrial Organizations ("AFL-CIO"). Prior to becoming General Counsel in 2023, I was Associate General Counsel for 12 years. I make this declaration based on my personal knowledge and on the AFL-CIO's records.

2. The AFL-CIO is a democratically governed federation of 63 labor unions that collectively represent about 15 million workers across the United States. The AFL-CIO's mission is to represent the interests of its affiliates and to ensure that all working people are treated fairly.

3. Many of the AFL-CIO's affiliates, including the plaintiffs in *AFL-CIO v. Trump*, No. 25-2445-PLF (D.D.C.), represent bargaining units of federal employees pursuant to the Federal Service Labor-Management Relations Statute ("FSLMRS").

1

**Issuance of Executive Order 14251**

4.      On March 27, 2025, the President issued an Executive Order entitled "Exclusions from Federal Labor-Management Relations Programs," Exec. Order No. 14251, 90 Fed. Reg. 14553 ("Executive Order").  Section 2 of the Executive Order excludes numerous federal agencies and subdivisions from the FSLMRS.  A true and correct copy of the Executive Order is attached hereto as Exhibit 1.

5.      On March 27, 2025, the White House issued a document entitled "Fact Sheet: President Donald J. Trump Exempts Agencies with National Security Missions from Federal Collective Bargaining Requirements" ("Fact Sheet") that addresses the Executive Order.  A true and correct copy of the Fact Sheet is attached hereto as Exhibit 2.

6.      On March 27, 2025, the Office of Personnel Management ("OPM") issued a document entitled "Guidance on Executive Order Exclusions from Federal Labor Management Relations Programs" ("OPM Guidance").  A true and correct copy of the OPM Guidance is attached hereto as Exhibit 3.

7.      On April 8, 2025, the Chief Human Capital Officers Council ("CHCOC"), an interagency forum led by the OPM Director, issued a Frequently Asked Questions (FAQs) document about implementing the Executive Order.  A true and correct copy of the April 8, 2025 FAQs is attached hereto as Exhibit 4.

8.      On April 22, 2025, CHCOC issued updated FAQs concerning the Executive Order.  A true and correct copy of the April 22, 2025 FAQs is attached hereto as Exhibit 5.

9.      Section 4 of the Executive Order delegated authority to the Secretaries of Defense and Veterans Affairs to issue orders suspending the operation of Section 2 of the Executive Order

to any subdivisions of their departments, thereby bringing such subdivisions within the FSLMRS.

10.    The Secretary of Veterans Affairs issued an order published in the Federal Register, 90 Fed. Reg. 73 (April 17, 2025) ("VA Certification") that suspended the application of Section 2 of the Executive Order to "employees represented by Laborers International Union of North America (LIUNA); Western Federation of Nurses and Health Professionals (WFNHP), Veterans Affairs Staff Nurse Council (VASNC) Local 5032 at the VA Medical Center Milwaukee, WI; International Association of Fire Fighters (IAFF–99) at the VA Medical Center, Little Rock, AR; United Nurses Association of California/Union of Healthcare Professionals (UNAC/UHCP) at the VA Medical Center, Loma Linda, CA; Teamsters Union Local 115 at the Department of Veterans Affairs Medical Center, Coatesville, PA; International Brotherhood of Electrical Workers (IBEW) Local 2168 at the Cheyenne WY VA Medical Center; and, International Association of Machinists and Aerospace Workers, (IAMAW) Local 1998 at the VA National Cemetery of the Pacific in Honolulu, HI." A true and correct copy of the VA Certification is attached as Exhibit 6.

11.    The Secretary of Defense issued an order published in the Federal Register, 90 Fed. Reg. 17,052 (April 23, 2025) ("DOD Certification"), that suspended the application of Section 2 of the Executive Order to "federal wage system employees in the trades at the following DOD component subdivisions: … (a) Letterkenny Munition Center, US Army Aviation and Missile Command, United States Army. (b) Air Force Test Center, Air Force Materiel Command, Department of Air Force. (c) Air Force Sustainment Center, Air Force Materiel Command, Department of Air Force. (d) Fleet Readiness Center Southeast." A true and correct copy of the DOD Certification is attached hereto as Exhibit 7.

3

**Coverage of Executive Order**

12.    The AFL-CIO estimates based on its records and information reported by the media that the Executive Order strips about 75 percent of the unionized federal workforce of their collective bargaining rights.  The AFL-CIO estimates that over 700,000 federal employees represented by AFL-CIO affiliates would lose their collective bargaining rights as a result of the Executive Order, including tens of thousands represented by the unions that are plaintiffs in this case.

13.    Some of the federal employee units that would lose their collective bargaining rights because of Section 2 of the Executive Order have had union representation since the 1960s, even before the FSLMRS was adopted in 1978.

14.    Prior to issuance of the Executive Order, federal agencies never suggested that the application of the FSLMRS to most of the federal workforce is inconsistent with national security.  The AFL-CIO was not consulted before the Executive Order was issued.

**Retaliation for exercise of First Amendment rights**

15.    The AFL-CIO and many of its affiliates that represent federal employees have been outspoken in criticizing President Trump's policies, including with respect to the dismantling of federal agencies. The AFL-CIO's website, for example, is filled with media releases that condemn the actions of the Executive Branch to fire federal employees and close federal agencies. *See* https://aflcio.org/press/releases.

16.    The AFL-CIO and many of its affiliates that represent federal employees have also been plaintiffs in lawsuits against the federal government that seek to prevent the Executive Branch from dismantling federal agencies in violation of statutes adopted by Congress and from providing access to sensitive data about employees in violation of the Privacy Act.  For example,

the AFL-CIO was the lead plaintiff in *AFL-CIO v. Department of Labor*, No. 25-339-JDB (D.D.C.), which challenged the disclosure of sensitive employee information to the "U.S. DOGE Service."

17.     The Executive Order would wipe out collective bargaining rights for most of the workers represented by AFL-CIO affiliates that have exercised their First Amendment rights to criticize President Trump's policies and filed lawsuits against the federal government to prevent the dismantling of federal agencies.

18.     By contrast, the Executive Order preserves collective bargaining rights for unions that have not opposed President Trump or his policies.

19.     Section 2 of the Executive Order provides that "nothing in this section shall exempt from the coverage of [FSLMRS] … the immediate, local employing offices of any agency police officers, security guards, or firefighters."  The country's largest law enforcement union, the National Fraternal Order of Police, endorsed President Trump's candidacy in 2016, 2020, and 2024, and President Trump has regularly touted those endorsements.

**Implementation of Executive Order**

20.     After issuance of the Executive Order, the AFL-CIO's affiliates reported that federal agencies had ceased deducting voluntary union membership dues and forwarding dues to the collective bargaining representative, as required by the FSLRMS and operative collective bargaining agreements.  As a result, the affiliates experienced an immediate loss of the revenue necessary to represent the bargaining units.

21.     While it is possible for unions to use other means to collect membership dues, as a practical matter the implementation of other methods is time consuming, expensive, and much

less efficient and effective than payroll deduction. The sudden and unilateral suspension of payroll deduction will, as a practical matter, result in the irreparable loss of dues revenue.

22.    The AFL-CIO's affiliates also reported that federal agencies were holding grievances "in abeyance" and refusing to participate in arbitrations while awaiting further guidance about the Executive Order. These grievances and arbitrations include disputes about matters that occurred prior to issuance of the Executive Order.

23.    Federal agencies initially represented to our affiliates that they did not intend to immediately terminate collective bargaining agreements or decertify unions based on Section 2 of the Executive Order. The CHCOC FAQs, cited above, state that "Agencies should not terminate any CBAs until the conclusion of litigation or further guidance from OPM directing such termination."

24.    On August 6, 2025, however, the Department of Veterans Affairs announced that it was terminating its collective bargaining agreements covering employees subject to Section 2 of the Executive Order. A copy of the Department's media release is attached as Exhibit 8.

25.    On August 8, 2025, the Environmental Protection Agency ("EPA") sent an email message to representatives of one of the AFL-CIO's affiliates stating that EPA was terminating collective bargaining agreements because of the Executive Order. A copy of the EPA's email message is attached as Exhibit 9.

26.    On August 8, 2025, the U.S. Coast Guard sent a memo to one of the AFL-CIO's affiliates stating that the Coast Guard was terminating its collective bargaining agreement with the affiliate because of the Executive Order. A copy of the Coast Guard memorandum is attached as Exhibit 10.

27.     On August 14, 2025, the federal government filed a letter in the Ninth Circuit stating that OPM had revised its prior guidance to federal agencies and that agencies are now free to formally repudiate their collective bargaining agreements. *See American Federation of Government Employees, AFL-CIO (AFGE) v. Trump*, No. 25-4014 (9th Cir.), Dkt. 34.1.  A copy of the letter filed in the Ninth Circuit is attached as Exhibit 11.

28.     As of the date this declaration is signed, the federal government has not provided the AFL-CIO with any guidance about whether and when other federal agencies intend to terminate collective bargaining agreements.

29.     The termination of collective bargaining agreements and exclusion from the protections of FSLRMS will leave federal workers with no contractual rights and no union representation.  It will also cause a loss of membership for the unions because many workers will not remain members of unions that cannot effectively serve as their representatives.  It will also cause a loss of revenue for the AFL-CIO because the AFL-CIO is supported by per capita payments from affiliates based on the number of workers they represent.

30.     Unless an injunction is issued, the government's implementation of the Executive Order will cause irreparable harm to unions and union-represented workers.  The employees will lose union representation in disciplinary matters, will lose procedural protections against reductions in force, will have no collective voice in dealing with government agencies, will lose all of their contractual protections, and will have no right to file grievances or have them resolved through arbitration.  The AFL-CIO's affiliates will not be able to perform their central function in representing federal employee bargaining units because they will have lost their official status as the recognized bargaining representatives and their contracts with federal agencies.

7

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct. Executed on August 20, 2025.

_____

Matthew J. Ginsburg

Exhibit 1

# Presidential Documents

Executive Order 14251 of March 27, 2025

## Exclusions From Federal Labor-Management Relations Programs

By the authority vested in me as President by the Constitution and the laws of the United States of America, including sections 7103(b)(1) of title 5 and 4103(b) of title 22, United States Code, to enhance the national security of the United States, it is hereby ordered:

**Section 1**. *Determinations.* (a) The agencies and agency subdivisions set forth in section 2 of this order are hereby determined to have as a primary function intelligence, counterintelligence, investigative, or national security work. It is also hereby determined that Chapter 71 of title 5, United States Code, cannot be applied to these agencies and agency subdivisions in a manner consistent with national security requirements and considerations.

(b) The agency subdivisions set forth in section 3 of this order are hereby determined to have as a primary function intelligence, counterintelligence, investigative, or national security work. It is also hereby determined that Subchapter X of Chapter 52 of title 22, United States Code, cannot be applied to these subdivisions in a manner consistent with national security requirements and considerations.

**Sec. 2**. *Additional National Security Exclusions.* Executive Order 12171 of November 19, 1979, as amended, is further amended by:

(a) In section 1–101, adding ''and Section 1–4'' after ''Section 1–2'' in both places that term appears.

(b) Adding after section 1–3 a new section 1–4 that reads:

''1–4. *Additional Exclusions.*

1–401. The Department of State.

1–402. The Department of Defense, except for any subdivisions excluded pursuant to section 4 of the Executive Order of March 27, 2025, entitled 'Exclusions from Federal Labor-Management Relations Programs.'

1–403. The Department of the Treasury, except the Bureau of Engraving and Printing.

1–404. The Department of Veterans Affairs.

1–405. The Department of Justice.

1–406. Agencies or subdivisions of the Department of Health and Human Services:

  (a) Office of the Secretary.

  (b) Food and Drug Administration.

  (c) Centers for Disease Control and Prevention.

  (d) Administration for Strategic Preparedness and Response.

  (e) Office of the General Counsel.

  (f) Office of Refugee Resettlement, Administration for Children and Families.

  (g) National Institute of Allergy and Infectious Diseases, National Institutes of Health.

1–407. Agencies or subdivisions of the Department of Homeland Security:

(a) Office of the Secretary.

(b) Office of the General Counsel.

(c) Office of Strategy, Policy, and Plans.

(d) Management Directorate.

(e) Science and Technology Directorate.

(f) Office of Health Security.

(g) Office of Homeland Security Situational Awareness.

(h) U.S. Citizenship and Immigration Services.

(i) United States Immigration and Customs Enforcement.

(j) United States Coast Guard.

(k) Cybersecurity and Infrastructure Security Agency.

(l) Federal Emergency Management Agency.

1–408. Agencies or subdivisions of the Department of the Interior:

(a) Office of the Secretary.

(b) Bureau of Land Management.

(c) Bureau of Safety and Environmental Enforcement.

(d) Bureau of Ocean Energy Management.

1–409. The Department of Energy, except for the Federal Energy Regulatory Commission.

1–410. The following agencies or subdivisions of the Department of Agriculture:

(a) Food Safety and Inspection Service.

(b) Animal and Plant Health Inspection Service.

1–411. The International Trade Administration, Department of Commerce.

1–412. The Environmental Protection Agency.

1–413. The United States Agency for International Development.

1–414. The Nuclear Regulatory Commission.

1–415. The National Science Foundation.

1–416. The United States International Trade Commission.

1–417. The Federal Communications Commission.

1–418. The General Services Administration.

1–419. The following agencies or subdivisions of each Executive department listed in section 101 of title 5, United States Code, the Social Security Administration, and the Office of Personnel Management:

(a) Office of the Chief Information Officer.

(b) any other agency or subdivision that has information resources management duties as the agency or subdivision's primary duty.

1–499. Notwithstanding the forgoing, nothing in this section shall exempt from the coverage of Chapter 71 of title 5, United States Code:

(a) the immediate, local employing offices of any agency police officers, security guards, or firefighters, provided that this exclusion does not apply to the Bureau of Prisons;

(b) subdivisions of the United States Marshals Service not listed in section 1–209 of this order; or

(c) any subdivisions of the Departments of Defense or Veterans Affairs for which the applicable Secretary has issued an order suspending the application of this section pursuant to section 4 of the Executive Order

of March 27, 2025, entitled 'Exclusions from Federal Labor-Management Relations Programs.' "

**Sec. 3.** *Foreign Service Exclusions.* Executive Order 12171, as amended, is further amended by:

(a) In the first paragraph:

(i) adding "and Section 4103(b) of Title 22," after "Title 5"; and

(ii) adding "and Subchapter X of Chapter 52 of Title 22" after "Relations Program."

(b) Adding after section 1–102 a new section 1–103 that reads:

"1–103. The Department subdivisions set forth in section 1–5 of this order are hereby determined to have as a primary function intelligence, counterintelligence, investigative, or national security work. It is also hereby determined that Subchapter X of Chapter 52 of title 22, United States Code, cannot be applied to those subdivisions in a manner consistent with national security requirements and considerations. The subdivisions set forth in section 1–5 of this order are hereby excluded from coverage under Subchapter X of Chapter 52 of title 22, United States Code."

(c) Adding after the new section 1–4 added by section 2(b) of this order a new section 1–5 that reads:

"1–5. Subdivisions of Departments Employing Foreign Service Officers. 1–501. Subdivisions of the Department of State:

(a) Each subdivision reporting directly to the Secretary of State.

(b) Each subdivision reporting to the Deputy Secretary of State.

(c) Each subdivision reporting to the Deputy Secretary of State for Management and Resources.

(d) Each subdivision reporting to the Under Secretary for Management.

(e) Each subdivision reporting to the Under Secretary for Arms Control and International Security.

(f) Each subdivision reporting to the Under Secretary for Civilian Security, Democracy, and Human Rights.

(g) Each subdivision reporting to the Under Secretary for Economic Growth, Energy, and Environment.

(h) Each subdivision reporting to the Under Secretary for Political Affairs.

(i) Each subdivision reporting to the Under Secretary for Public Diplomacy.

(j) Each United States embassy, consulate, diplomatic mission, or office providing consular services.

1–502. Subdivisions of the United States Agency for International Development:

(a) All Overseas Missions and Field Offices.

(b) Each subdivision reporting directly to the Administrator.

(c) Each subdivision reporting to the Deputy Administrator for Policy and Programming.

(d) Each subdivision reporting to the Deputy Administrator for Management and Resources.".

**Sec. 4.** *Delegation of Authority to the Secretaries of Defense and Veterans Affairs.* (a) Subject to the requirements of subsection (b) of this section, the Secretaries of Defense and Veterans Affairs are delegated authority under 5 U.S.C. 7103(b)(1) to issue orders suspending the application of section 1–402 or 1–404 of Executive Order 12171, as amended, to any subdivisions of the departments they supervise, thereby bringing such subdivisions under the coverage of the Federal Service Labor-Management Relations Statute.

(b) An order described in subsection (a) of this section shall only be effective if:

(i) the applicable Secretary certifies to the President that the provisions of the Federal Service Labor-Management Relations Statute can be applied to such subdivision in a manner consistent with national security requirements and considerations; and

(ii) such certification is submitted for publication in the *Federal Register* within 15 days of the date of this order.

Sec. 5. *Delegation of Authority to the Secretary of Transportation.* (a) The national security interests of the United States in ensuring the safety and integrity of the national transportation system require that the Secretary of Transportation have maximum flexibility to cultivate an efficient workforce at the Department of Transportation that is adaptive to new technologies and innovation. Where collective bargaining is incompatible with that mission, the Department of Transportation should not be forced to seek relief through grievances, arbitrations, or administrative proceedings.

(b) The Secretary of Transportation is therefore delegated authority under section 7103(b) of title 5, United States Code, to issue orders excluding any subdivision of the Department of Transportation, including the Federal Aviation Administration, from Federal Service Labor-Management Relations Statute coverage or suspending any provision of that law with respect to any Department of Transportation installation or activity located outside the 50 States and the District of Columbia. This authority may not be further delegated. When making the determination required by 5 U.S.C. 7103(b)(1) or 7103(b)(2), the Secretary of Transportation shall publish his determination in the *Federal Register*.

Sec. 6. *Implementation.* With respect to employees in agencies or subdivisions thereof that were previously part of a bargaining unit but have been excepted under this order, each applicable agency head shall, upon termination of the applicable collective bargaining agreement:

(a) reassign any such employees who performed non-agency business pursuant to section 7131 of title 5 or section 4116 of title 22, United States Code, to performing solely agency business; and

(b) terminate agency participation in any pending grievance proceedings under section 7121 of title 5, United States Code, exceptions to arbitral awards under section 7122 of title 5, United States Code, or unfair labor practice proceedings under section 7118 of title 5 or section 4116 of title 22, United States Code, that involve such employees.

Sec. 7. *Additional Review.* Within 30 days of the date of this order, the head of each agency with employees covered by Chapter 71 of title 5, United States Code, shall submit a report to the President that identifies any agency subdivisions not covered by Executive Order 12171, as amended:

(a) that have as a primary function intelligence, counterintelligence, investigative, or national security work, applying the definition of "national security" set forth by the Federal Labor Relations Authority in Department of Energy, Oak Ridge Operations, and National Association of Government Employees Local R5–181, 4 FLRA 644 (1980); and

(b) for which the agency head believes the provisions of Chapter 71 of title 5, United States Code, cannot be applied to such subdivision in a manner consistent with national security requirements and considerations, and the reasons therefore.

Sec. 8. *General Provisions.* (a) Nothing in this order shall be construed to impair or otherwise affect:

(i) the authority granted by law to an executive department or agency, or the head thereof; or

(ii) the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

(b) This order shall be implemented consistent with applicable law and subject to the availability of appropriations.

(c) This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party

against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

THE WHITE HOUSE,
*March 27, 2025.*

[FR Doc. 2025–05836
Filed 4–2–25; 8:45 am]
Billing code 3395–F4–P

Exhibit 2

*The* WHITE HOUSE

FACT SHEETS

Fact Sheet: President Donald J. Trump Exempts Agencies with National
Security Missions from Federal Collective Bargaining Requirements

The White House

March 27, 2025

**PROTECTING OUR NATIONAL SECURITY:** Today, President Donald J. Trump signed an Executive Order using authority granted by the Civil Service Reform Act of 1978 (CSRA) to end collective bargaining with Federal unions in the following agencies with national security missions:

- ***National Defense.*** Department of Defense, Department of Veterans Affairs (VA), the National Science Foundation (NSF), and Coast Guard.
  - VA serves as the backstop healthcare provider for wounded troops in wartime.
  - NSF-funded research supports military and cybersecurity breakthroughs.

- ***Border Security.*** Department of Homeland Security (DHS) leadership components, U.S. Citizenship and Immigration Services, U.S. Immigration and Customs Enforcement, the Department of Justice's (DOJ) Executive Office of Immigration Review, and the Office of Refugee Resettlement within the Department of Health and Human Services (HHS).

- ***Foreign Relations.*** Department of State, U.S. Agency for International Development, Department of Commerce's International Trade Administration, and U.S. International Trade Commission.
  - President Trump has demonstrated how trade policy is a national security tool.

- ***Energy Security.*** Department of Energy, Nuclear Regulatory Commission, Environmental Protection Agency, and Department of Interior units that govern domestic energy production.
  - The same Congress that passed the CSRA declared that energy insecurity threatens national security.

- ***Pandemic Preparedness, Prevention, and Response.*** Within HHS, the Secretary's Office, Office of General Counsel, Centers for Disease Control and Prevention, Administration for Strategic Preparedness and Response, Food and Drug Administration, and National Institute of Allergy and Infectious Diseases. In the Department of Agriculture, the Office of General Counsel, Food Safety and Inspection Service, and Animal and Plant Health Inspection Service.
  - COVID-19 and the recent bird flu have demonstrated how foreign pandemics affect national security.
  - VA is also a backstop healthcare provider during national emergencies, and served this role during COVID-19.

- ***Cybersecurity.*** The Office of the Chief Information Officer in each cabinet-level department, as well as DHS's Cybersecurity and Infrastructure Security Agency, the Federal Communications Commission (FCC), and the General Services Administration (GSA).
  - The FCC protects the reliability and security of America's telecommunications networks.
  - GSA provides cybersecurity related services to agencies and ensures they do not use compromised telecommunications products.

- ***Economic Defense.*** Department of Treasury.
  - The Federal Labor Relations Authority (FLRA) defines national security to include protecting America's economic and productive strength. The Treasury Department collects the taxes that fund the government and ensures the stable operations of the financial system.

- ***Public Safety.*** Most components of the Department of Justice as well as the Federal Emergency Management Agency.

- ***Law Enforcement Unaffected***. Police and firefighters will continue to collectively bargain.

**ENSURING THAT AGENCIES OPERATE EFFECTIVELY:** The CSRA enables hostile Federal unions to obstruct agency management. This is dangerous in agencies with national security responsibilities:

- Agencies cannot modify policies in collective bargaining agreements (CBAs) until they expire.
  - The outgoing Biden Administration renegotiated many agencies' CBAs to last through President Trump's second term.

- Agencies cannot make most contractually permissible changes until after finishing "midterm" union bargaining.
  - For example, the FLRA ruled that ICE could not modify cybersecurity policies without giving its union an opportunity to negotiate, and then completing midterm bargaining.

- Unions used these powers to block the implementation of the VA Accountability Act; the Biden Administration had to offer reinstatement and backpay to over 4,000 unionized employees that the VA had removed for poor performance or misconduct.

**SAFEGUARDING AMERICAN INTERESTS:** President Trump is taking action to ensure that agencies vital to national security can execute their missions without delay and protect the American people. The President needs a responsive and accountable civil service to protect our national security.

- Certain Federal unions have declared war on President Trump's agenda.
  - The largest Federal union describes itself as "fighting back" against Trump. It is widely filing grievances to block Trump policies.
  - For example, VA's unions have filed 70 national and local grievances over President Trump's policies since the inauguration—an average of over one a day.

- Protecting America's national security is a core constitutional duty, and President Trump refuses to let union obstruction interfere with his efforts to protect Americans and our national interests.

- President Trump supports constructive partnerships with unions who work with him; he will not tolerate mass obstruction that jeopardizes his ability to manage agencies with vital national security missions.

NEWS

ADMINISTRATION

ISSUES

Exhibit 3



**UNITED STATES OFFICE OF PERSONNEL MANAGEMENT**
Washington, DC 20415

The Director

# MEMORANDUM

| | |
|---|---|
| **TO:** | Heads and Acting Heads of Departments and Agencies |
| **FROM:** | Charles Ezell, Acting Director, U.S. Office of Personnel Management |
| **DATE**: | March 27, 2025 |
| **RE**: | Guidance on Executive Order *Exclusions from Federal Labor-Management Programs* |

On March 27, 2025, President Trump signed an executive order entitled *Exclusions from Federal Labor-Management Relations Programs* (*Exclusions*). This order invoked the President's authority under 5 U.S.C § 7103(b)(1) and 22 U.S.C. § 4103(b) to exempt agencies and agency subdivisions from the provisions of the Federal Service Labor-Management Relations Statute and the Foreign Service Labor-Management Relations Statute (individually and collectively, the FSLMRS).[1] The President's Executive Order directs that the FSLMRS will no longer apply to the following agencies and agency subdivisions (collectively, the "covered agencies and subdivisions"):

- The Department of Defense;

- The Department of State;

- The Department of the Treasury, except the Bureau of Engraving and Printing;

- The Department of Veterans Affairs (VA);

- The Department of Justice, except certain components of the U.S. Marshals Service;

- Subdivisions of the Department of Homeland Security:
  - Departmental Headquarters components;
  - U.S. Citizenship and Immigration Services;
  - Immigration and Customs Enforcement;
  - U.S. Coast Guard;
  - The Cybersecurity and Infrastructure Security Agency; and
  - The Federal Emergency Management Agency;

---

[1] These provisions are codified in chapter 71 of title 5, United States Code, and subchapter X of chapter 52 of title 22, United States Code.

- Subdivisions of the Department of Health and Human Services:
    - o  Office of the Secretary;
    - o  Office of the General Counsel;
    - o  Food and Drug Administration;
    - o  Centers for Disease Control and Prevention;
    - o  The Administration for Strategic Preparedness and Response;
    - o  The National Institute for Allergy and Infectious Diseases, National Institutes of Health; and
    - o  Office of Refugee Resettlement, Administration for Children and Families.

- The Department of Energy, except the Federal Energy Regulatory Commission;

- Subdivisions of the Department of the Interior:
    - o  Office of the Secretary;
    - o  Bureau of Land Management;
    - o  Bureau of Safety and Environmental Enforcement;
    - o  Bureau of Ocean Energy Management;

- Subdivisions of the Department of Agriculture:
    - o  The Food Safety and Inspection Service;
    - o  The Animal and Plant Health Inspection Service;

- The International Trade Administration within the Department of Commerce;

- The Environmental Protection Agency;

- The U.S. Agency for International Development;

- The Nuclear Regulatory Commission;

- The National Science Foundation;

- The International Trade Commission;

- The Federal Communications Commission;

- The General Services Administration; and

- The Office of the Chief Information Officer (CIO) in each Executive department, as well as the CIO offices for the U.S. Office of Personnel Management (OPM) and the Social Security Administration, and any other agency or subdivision that has information

resources management duties as the agency or subdivision's primary duty.[2]

By operation of 5 U.S.C. § 7103(b) and *Exclusions*, covered agencies and subdivisions are no longer subject to the collective-bargaining requirements of chapter 71 of part III, subpart F of title 5 (5 U.S.C. §§ 7101-7135). Consequently, those agencies and subdivisions are no longer required to collectively bargain with Federal unions. Also, because the statutory authority underlying the original recognition of the relevant unions no longer applies, unions lose their status as the "exclusive[ly] recogni[zed]" labor organizations for employees of the agencies and agency subdivisions covered by *Exclusions*.[3]

Agencies should consult with their General Counsels as to how to implement the President's directive in *Exclusions*. Agencies should also begin to consider and implement the changes described below and any others that agencies deem necessary, consistent with the President's national security determination. OPM highlights some common provisions of agency CBAs that may be inconsistent with the President's policies and management priorities.

## I.    Performance Accountability

Merit system principles codified at 5 U.S.C. § 2301(6) direct agencies to separate employees who cannot or will not improve their performance to meet required standards. This often does not occur. When asked what happens to poor performers in their work unit, a plurality of Federal employees respond that they "remain in the work unit and continue to underperform."[4] Only a quarter of agency supervisors report that they are confident they could remove a seriously underperforming employee.[5]

Strengthening performance accountability in the Federal workforce is a high priority of President Trump and his Administration. The President believes that he must be able to effectively supervise Federal employees to take care that the law is faithfully executed and to protect America's national security. Shortly after taking office the President issued multiple directives to facilitate the separation of underperforming employees.[6]

Agency CBAs often create procedural impediments to separating poor performers beyond those required by statute or regulation. Covered agencies and subdivisions should seek to bring

---

[2] The Executive Order excludes the immediate employing offices of police and firefighters. It also provides a process for the Secretaries of Defense and Veterans Affairs to retain collective bargaining in subdivisions of their agencies if they certify that doing so does not impair national security.

[3] *Cf.* 5 U.S.C. § 7111(a) ("An agency shall accord exclusive recognition to a labor organization if the organization has been selected as the representative . . . ."), *id.* § 7114(a)(1) (authorizing the exclusively recognized labor organization to "negotiate collective bargaining agreements covering[] all employees in the unit.")

[4] https://www.opm.gov/fevs/reports/opm-fevs-dashboard/.

[5] U.S. Merit Systems Protection Board, *Remedying Unacceptable Employee Performance in the Federal Civil Service* (June 18, 2019), at p. 15.

[6] *See* Executive Order 14171 of Jan. 20, 2025 (*Restoring Accountability to Policy-Influencing Positions Within the Federal Workforce*); Memorandum of January 20, 2025 (*Restoring Accountability for Career Senior Executives*); Executive Order 4211 of Feb. 12, 2025 (*One Voice for America's Foreign Relations*).

their policies into alignment with the specific Administration priorities below.

### A. Limit PIPs to 30 Days.

The Civil Service Reform Act (CSRA) requires agencies to provide underperforming employees with an opportunity to demonstrate acceptable performance before dismissing them under chapter 43 of title 5, United States Code.[7] These opportunity periods are commonly known as Performance Improvement Periods (PIPs). Executive Order 13839 of May 25, 2018. (*Promoting Accountability and Streamlining Removal Procedures Consistent with Merit System Principles*) generally standardized PIPs at 30 days. Executive Order 14003 of January 22, 2021 (*Protecting the Federal Workforce*) rescinded Executive Order 13839 and directed agencies to reverse policies effectuated under it. Under this directive, agencies increased PIPs from 30 days to 60 to 120 days. However, Executive Order 14171 of January 20, 2025 (*Restoring Accountability to Policy-Influencing Positions Within the Federal Workforce*) revoked Executive Order 14003 and directed agencies to reverse disciplinary and unacceptable-performance policies effectuated pursuant to it.

Prior OPM guidance has explained that Executive Order 14171 now requires agencies to return to the policies of Executive Order 13839.[8] Agencies are accordingly required to, consistent with applicable law, return PIPs to 30 days. Where a CBA requires PIPs of more than 30 days, agencies must generally wait until such CBAs expire or otherwise terminate before shortening PIPs.[9] After covered agencies and subdivisions terminate CBAs that require PIPs of more than 30 days, they should take prompt action to reduce PIPs for former bargaining unit employees to no more than 30 days.

### B. Use Chapters 43 and 75 for Performance-Based Removals.

Covered agencies and subdivisions are required to revert their discipline and unacceptable performance policies to those set in the first Trump Administration under Executive Order 13839. This includes the directive to use the procedures of chapter 75 of title 5, United States Code, in addition to chapter 43 (discussed above), to separate employees for unacceptable performance in appropriate cases.[10]

Chapter 75 actions do not require a PIP but bear a higher burden of proof than chapter 43 actions. Many agency CBAs functionally prohibit using chapter 75 procedures by requiring PIPs for all performance-based separations. Covered agencies and subdivisions that have terminated their CBAs should thereafter use chapter 75 procedures to separate underperforming employees without PIPs in appropriate cases. Agencies may continue to use chapter 43 procedures in appropriate cases.

### C. VA Should Resume Use of Section 714.

---

[7] 5 U.S.C. 4202(c)(6).
[8] OPM, *Guidance on Revocation of Executive Order 14003* (Feb. 7, 2025).
[9] 5 U.S.C. 7116(a)(7).
[10] See section 2(h) of Executive Order 13839.

In 38 U.S.C. § 714, Congress gave VA special authority to remove some employees for poor performance without a PIP and with a lower burden of proof than chapter 43 actions. The Biden Administration discontinued use of section 714 authority after an arbitrator held that VA could not renegotiate its CBA to eliminate contractual PIPs. VA should, upon termination of its CBA, consider whether to resume use of section 714 authority in appropriate cases. Where facts and circumstances warrant, VA should cease providing covered employees with PIPs before separating them for poor performance under section 714.

### D. Discontinue Grievance Participation.

In keeping with the provisions of the FSLMRS, CBAs provide for binding arbitration of union grievances, including disputes over whether personnel actions were justified.[11] To implement *Exclusions*, agencies should cease participating in grievance procedures after terminating their CBAs. To the extent that covered agencies and subdivisions are litigating grievances before an arbitrator when they terminate their CBAs, they should discontinue participation in such proceedings upon termination. Agencies can and should compensate arbitrators for work performed prior to the termination of the CBA, but not for any work performed thereafter. Agencies should not participate in further grievance arbitration proceedings following termination of their CBAs.

## II.    Effective and Efficient Government

It is the policy of the President and his Administration to eliminate waste, bloat, and insularity within agencies and operate them more efficiently. Covered agencies and subdivisions should therefore take the following actions after terminating their CBAs.

### A. Disregard Contractual RIF Articles.

The President has directed agencies to prepare large-scale reductions in force (RIFs).[12] OPM previously provided guidance about agency collective bargaining obligations when undertaking RIFs.[13] Covered agencies and subdivisions that terminate their CBAs are advised that this guidance will no longer apply. After terminating their CBAs, covered agencies and subdivisions should conduct RIFs consistent with applicable statutory and regulatory requirements, but without regard to provisions in terminated CBAs that go beyond those requirements.

### B. Return to In-Person Work.

The President considers returning agency employees to in-person work necessary for effective and efficient agency operations. The President issued a memorandum generally requiring

---

[11] 5 U.S.C. § 7121.

[12] OPM, *Guidance on Agency RIF and Reorganization Plans Requested by Implementing The President's "Department of Government Efficiency" Workforce Optimization Initiative* (February 26, 2025).

[13] OPM, *Guidance on Collective Bargaining in Connection with Reductions in Force* (March 12, 2025).

in-person work on the first day of his Administration.[14] OPM guidance has explained that substantive telework levels and the substantive determination of which positions are eligible for telework or remote work are non-negotiable management rights.[15] However, agency CBAs sometimes impose procedural restrictions on agency return to work policies that do not violate non-negotiable management rights. Upon termination of these CBAs, covered agencies and subdivisions should swiftly implement the President's directives in *Return to In-Person Work*.

### C.  Use Agency Resources for Agency Business.

The FSLMRS permits unions to negotiate to allow agency employees to perform union representational work instead of agency business during their official duty hours.[16] Contractual authorization for "taxpayer-funded union time" terminates when agency CBAs are terminated. Additionally, employees no longer have representational activities to conduct once their agency or subdivision has been excluded from the FSLMRS coverage. *Exclusions* requires agencies to promptly return such employees to performing solely agency business. Upon termination of any CBAs that require taxpayer-funded union time, agencies should reassign employees on union time to duties that solely include agency business.

Many agency CBAs similarly provide Federal unions with free use of agency resources (such as office space) or commit the agency to cover certain union expenses (such as the cost of travel and per diems). Following termination of CBAs that require such subsidies, covered agencies and subdivisions should promptly discontinue them and use agency resources only for agency business.

### D.  End Allotments Through Agency Payroll Systems.

The FSLMRS requires agencies to deduct union dues from employees' pay upon request.[17] Agency resources are expended to set up those payroll deductions and process payments, and many agency CBAs contractually commit agencies to making such allotments according to specified procedures. When a covered agency terminates its CBAs, those contractual commitments no longer apply, and the covered agency should terminate allotments except where required by statute. Agency employees may make other arrangements for dues payments if they wish to do so. However, agency resources ordinarily should not be expended to facilitate payment of union dues.

cc: Chief Human Capital Officers (CHCOs), Deputy CHCOs, Human Resources Directors, and Chiefs of Staff

---

[14] Memorandum of January 20, 2025 (*Return to In-Person Work*).
[15] OPM, *Guidance on Collective Bargaining Obligations in Connection with Return to In-Person Work* (February 3, 2025).
[16] 5 U.S.C. 7131(d), 22 U.S.C. 4118(d)(4).
[17] 5 U.S.C. 7115, 22 U.S.C. 4118(a).

Exhibit 4

**Frequently Asked Questions**

**Executive Order 14251:**
**"Exclusions from Federal Labor-Management Relations Programs"**

**Q1:** What do agencies need to do to terminate applicable CBAs?

**A1:** Agencies should not terminate any CBAs until the conclusion of litigation or further guidance from OPM directing such termination. Agencies should review relevant case law and consult with their General Counsels regarding next steps with any existing CBAs. See *Department of Labor*, 70 FLRA 27 (FLRA 2016).

**Q2:** Should agencies decertify bargaining units of covered agencies or subdivisions?

**A2:** Agencies should not file any decertification petitions until litigation regarding *Exclusions* has been resolved. **Only after the litigation is final and the Administration has assessed the implications of its outcome** should agencies consider filing Federal Labor Relations Authority (FLRA) petitions to clarify that bargaining units include only those positions not exempted from collective-bargaining requirements under *Exclusions*. Agencies should consult their General Counsels for updates on the litigation, and before taking steps to file a decertification petition in compliance with the *Exclusions* order.

**Q3:** Should agencies amend current filings with the FLRA for exceptions to arbitration awards where an arbitrator ordered relief for a bargaining unit covered under *Exclusions*?

**A3:** Agencies should ask the FLRA to hold these cases in abeyance pending the outcome of litigation, where practicable. In cases with pending deadlines for submissions, agencies should ask the FLRA to suspend or extend those deadlines until the conclusion of the litigation. If the FLRA does not suspend deadlines or hold cases in abeyance agencies should take the position that the union lacks standing as it is not recognized as a result of *Exclusions*.

**Q4:** In any ongoing proceedings in which an agency is asked to submit a statement of position regarding an unfair labor practice charge under investigation by the FLRA, should agencies submit a statement?

**A4:** Yes. However, agencies should raise to the appropriate FLRA regional office that the relevant agency or agency subdivision is no longer subject to provisions of the Federal Service Labor-Management Relations Statute (FSLMRS) per the *Exclusions* order and, therefore, the union no longer has standing to file a charge or the FLRA to issue a complaint.

**Q5:** Should agencies and agency subdivisions covered by *Exclusions* continue to participate in the FLRA's Collaboration and Alternative Dispute Resolution Office (CADRO) with labor unions representing police officers, security guards, and firefighters? What about bargaining units comprised of other occupations?

**A5:** Agencies may continue collective bargaining activities, including dispute resolution efforts with CADRO and other third-party proceedings with unions representing police officers, security guards, and firefighters, provided that these unions continue to be recognized consistent with

*Exclusions*. However, for matters involving a dispute for any unit that represents positions now excluded under Executive Order 12171, as amended, agencies should continue those dispute resolution activities only if they are doing so independently of any requirements of a CBA and not relying on any provisions of Chapter 71 to compel their participation.

**Q6:** Should agencies change the bargaining unit status codes on employees' SF-50s?

**A6:** Not at this time. Agencies should wait until litigation is resolved before doing so.

**Q7:** What is meant by the term "subdivision?"

**A7:** The term "subdivision" refers to any organization, office, or component that is subordinate to an agency or department head, as well as any division within those organizations, offices, or components.

**Q8:** What is meant by Section 2 of Executive Order 14251 (*Exclusions*) where it states: "the immediate, local employing offices of any agency police officers, security guards, or firefighters…"

**A8:** This means an agency or subdivision that directly supervises and employs such employees at the local level. Although this category will generally include purely the law enforcement officers in question, in some cases this may also include the administrative staff who support law enforcement operations.

**Q9**: What actions should agencies take regarding bargaining units that represent both (i) employees in positions *not* subject to exclusion (e.g., police officers, security guards, firefighters) and (ii) agency employees now *excluded* under the President's new directive?

**A9:** Agencies should preserve the rights of employees not excluded from collective bargaining including continuing to participate in third-party procedures (e.g., arbitrations) that are focused solely on conditions of employment, contractual and statutory obligations, or other matters limited to these employees. For employees no longer included in a bargaining unit, agencies should follow the direction provided in this guidance. If agencies need further guidance, please contact OPM at awr@opm.gov.

**Q10:** If an employee is no longer permitted to join or form a labor organization under the FSLMRS, can he or she strike against the Government while serving as a federal employee?

**A10:** Under 5 U.S.C. § 7311, employee strikes against the Government of the United States are prohibited for all Federal employees, irrespective of whether they are in a bargaining unit.

**Q11:** Can grievances initially filed under a negotiated grievance process (5 U.S.C. 7121) be transitioned to an administrative grievance process?

**A11:** Yes, provided the matter is not excluded by the agency's administrative grievance procedure and the grievant timely requests a transition to the administrative grievance procedure.

**Q12:** Are unions ineligible as employee representatives under the FSLMRS permitted to establish

consultative relationships with agencies pursuant to 5 C.F.R. Part 251?

**A12:** OPM's regulations "[provide] a framework for consulting and communicating with **non-labor organizations** representing Federal employees and with other organizations on matters related to agency operations and personnel management." A union is a "labor organization," as defined in 5 U.S.C. 7103(a)(4), and is therefore, not covered by 5 C.F.R. Part 251 whether they represent bargaining unit employees at an agency or not.

**Q13:** With announcement of the new Executive Order, *Exclusions*, are covered agencies still required to submit data to OPM regarding taxpayer-funded union time (TFUT), collective bargaining costs, and other labor relations data points?

**A13:** Yes. Please continue to collect and timely submit agency labor relations data as requested, even if the agency or subdivision therein is now exempted from the provisions of the FSLMRS.

**Q14:** What should we do with agreements that are pending Agency Head Review (AHR) and cover newly excluded agencies, subdivisions, or partial groups?

**A14:** Agencies should exercise their agency head authority under 5 U.S.C. § 7114(c) to disapprove any agreement currently undergoing review for units that are no longer recognized within a covered agency or subdivision. Agencies should cite to *Exclusions* or, if applicable, the presidential memorandum *Limiting Lame-Duck Collective Bargaining Agreements That Improperly Attempt to Constrain the New President*, as their basis for disapproval. For agreements that include positions not subject to exclusion from collective bargaining (e.g., police officers, security guards, firefighters), agencies should conduct AHR as they normally would. Lastly, for agreements that include a mix of excluded and included units, agencies should continue AHR and include a note that the agreement only covers those not excluded by Executive Order 14251 and that the agreement has no applicability to other employees.

**Q15:** For agencies that are currently bargaining with unions, are there any concerns with solidifying and executing agreements such as tentative agreements or memoranda of understandings or agreements (MOUs or MOAs)?

**A15:** Agencies should suspend such negotiations until the conclusion of litigation.

**Q16:** In Section 2 of *Exclusions,* 1-419 states: "The following agencies or subdivisions of each Executive department listed in section 101 of title 5, United States Code, the Social Security Administration, and the Office of Personnel Management: (a) Office of the Chief Information Officer (OCIO); (b) any other agency or subdivision that has information resources management duties as the agency or subdivision's primary duty." Does this apply to all OCIO offices within an agency not listed in *Exclusions*?

**A16:** This provision applies only to CIO offices in the Executive Departments (see 5 U.S.C. 101), OPM, and the Social Security Administration, as well as the subordinate agencies and offices under those Departments/agencies.

**Q17**: What does information resources management mean as used in Section 2 of *Exclusions*?

**A17**: The Paperwork Reduction Act defines "information resources management" at 44 U.S.C. § 3502(7), as "the process of managing information resources to accomplish agency missions and to improve agency performance, including through the reduction of information collection burdens on the public."

Exhibit 5

**Frequently Asked Questions**

**Executive Order 14251:**
**"Exclusions from Federal Labor-Management Relations Programs"**

**Q1:** What do agencies need to do to terminate applicable CBAs?

**A1:** Agencies should not terminate any CBAs until the conclusion of litigation or further guidance from OPM directing such termination. Agencies should review relevant case law and consult with their General Counsels regarding next steps with any existing CBAs. See *Department of Labor*, 70 FLRA 27 (FLRA 2016).

**Q2:** Should agencies decertify bargaining units of covered agencies or subdivisions?

**A2: No,** agencies should not file any decertification petitions until litigation regarding *Exclusions* has been resolved. **Only after the litigation is final and the Administration has assessed the implications of its outcome** should agencies consider filing Federal Labor Relations Authority (FLRA) petitions.  Upon the conclusion of the litigation as conveyed by the White House Counsel's Office and OPM, agencies may file decertification clarifying that bargaining units include only those positions not exempted from collective-bargaining requirements under *Exclusions*. Agencies should consult their General Counsels for updates on the litigation, and before taking steps to file a decertification petition in compliance with the *Exclusions* order.

**Q3:** Should agencies amend current filings for exceptions to arbitration awards where an arbitrator ordered relief for a bargaining unit covered under *Exclusions*?

**A3:** Agencies should ask the FLRA to hold these cases in abeyance pending the outcome of litigation, where practicable. In cases with pending deadlines for submissions, agencies should ask the FLRA to suspend or extend those deadlines until the conclusion of the litigation. If the FLRA does not suspend deadlines or hold cases in abeyance agencies should take the position that the union lacks standing as it is not recognized as a result of *Exclusions*.

**Q4:** In any ongoing proceedings in which an agency is asked to submit a statement of position regarding an unfair labor practice charge under investigation by the FLRA, should agencies submit a statement?

**A4:** Yes. The statement should mention, and agencies should identify  for the appropriate FLRA regional office, the Administration's position that the relevant agency or agency subdivision is no longer subject to provisions of the Federal Service Labor-Management Relations Statute (FSLMRS) per the *Exclusions* order. Under that position, the union no longer has standing to file a charge or the FLRA to issue a complaint.

**Q5:** Should agencies and agency subdivisions covered by *Exclusions* continue to participate in the FLRA's Collaboration and Alternative Dispute Resolution Office (CADRO) with labor unions representing police officers, security guards, and firefighters? What about bargaining units comprised                              of                            other                            occupations?

**A5:** Agencies may continue collective bargaining activities, including dispute resolution efforts with CADRO and other third-party proceedings with unions representing police officers, security

guards, and firefighters, provided that these unions continue to be recognized consistent with *Exclusions*. However, for matters involving a dispute for any unit that represents positions now excluded under Executive Order 12171, as amended, agencies should continue those dispute resolution activities only if they are doing so independently of any requirements of a CBA and not relying on any provisions of Chapter 71 to compel their participation.

**Q6:** Should agencies change the bargaining unit status codes on employees' SF-50s?

**A6:** Not at this time. Agencies should wait until litigation is resolved before doing so.

**Q7:** What is meant by the term "subdivision?"

**A7:** The term "subdivision" refers to any organization, office, or component that is subordinate to an agency or department head, as well as any division within those organizations, offices, or components.

**Q8:** What is meant by Section 2 of Executive Order 14251 (*Exclusions*) where it states: "the immediate, local employing offices of any agency police officers, security guards, or firefighters…"

**A8:** This means an agency or subdivision that directly supervises and employs such employees at the local level. Although this category will generally include purely the law enforcement officers in question, in some cases this may also include the administrative staff who support law enforcement operations.

**Q9**: What actions should agencies take regarding bargaining units that represent both (i) employees in positions *not* subject to exclusion (e.g., police officers, security guards, firefighters) and (ii) agency employees now *excluded* under the President's new directive?

**A9:** Agencies should preserve the rights of employees not excluded from collective bargaining including by continuing to participate in third-party procedures (e.g., arbitrations) that are focused solely on conditions of employment, contractual and statutory obligations, or other matters limited to these employees. For employees no longer included in a bargaining unit, agencies should follow the direction provided in this guidance. If agencies need further guidance, please contact OPM at awr@opm.gov.

**Q10:** If an employee is no longer permitted to join or form a labor organization under the FSLMRS, may he or she strike against the Government while serving as a federal employee?

**A10:** Under 5 U.S.C. § 7311, employee strikes against the Government of the United States are prohibited for all Federal employees, irrespective of whether they are in a bargaining unit.

**Q11:** Can grievances initially filed under a negotiated grievance process (5 U.S.C. 7121) be transitioned to an administrative grievance process?

**A11:** Yes. Agencies may transfer a grievance initially filed under a negotiated grievance procedure to its internal administrative grievance procedure provided the matter is not excluded by the agency's administrative grievance procedure and the grievant timely requests to transition to the administrative grievance procedure.

**Q12:** Are unions ineligible as employee representatives under the FSLMRS permitted to establish consultative relationships with agencies pursuant to 5 C.F.R. Part 251?

**A12:** OPM's regulations "[provide] a framework for consulting and communicating with **non-labor organizations** representing Federal employees and with other organizations on matters related to agency operations and personnel management." *See* 5 C.F.R. Part 251 (emphasis added). A union is a "labor organization," as defined in 5 U.S.C. 7103(a)(4), and is therefore, not covered by 5 C.F.R. Part 251 whether they represent bargaining unit employees at an agency or not.

**Q13:** With announcement of the new Executive Order, *Exclusions*, are covered agencies still required to submit data to OPM regarding taxpayer-funded union time (TFUT), collective bargaining costs, and other labor relations data points?

**A13:** Yes. Please continue to collect and timely submit agency labor relations data as requested, even if the agency or subdivision therein is now exempted from the provisions of the FSLMRS.

**Q14:** What should we do with agreements that are pending Agency Head Review (AHR) and cover newly excluded agencies, subdivisions, or partial groups?

**A14:** Agencies should exercise their agency head authority under 5 U.S.C. § 7114(c) to disapprove any agreement currently undergoing review for units that are no longer recognized within a covered agency or subdivision. Agencies should cite to *Exclusions* or, if applicable, the presidential memorandum *Limiting Lame-Duck Collective Bargaining Agreements That Improperly Attempt to Constrain the New President*, as their basis for disapproval. For agreements that include positions not subject to exclusion from collective bargaining (e.g., police officers, security guards, firefighters), agencies should conduct AHR as they normally would. Lastly, for agreements that include a mix of excluded and included units, agencies should continue AHR and include a note that the agreement only covers those not excluded by Executive Order 14251 and that the agreement has no applicability to other employees.

**Q15:** For agencies that are currently bargaining with unions, are there any concerns with solidifying and executing agreements such as tentative agreements or memoranda of understandings or agreements (MOUs or MOAs)?

**A15:** Agencies should suspend such negotiations until the conclusion of litigation, meaning bargaining sessions should be placed on hold along with implementation of changes to conditions of employment that were being bargained. Where agencies need execute an agreement through a ministerial act (e.g., signing an agreement), agencies may proceed to do so provided that any such agreement is consistent with the policy priorities of the Trump Administration.

**Q16:** In Section 2 of *Exclusions,* 1-419 states: "The following agencies or subdivisions of each Executive department listed in section 101 of title 5, United States Code, the Social Security Administration, and the Office of Personnel Management: (a) Office of the Chief Information Officer (OCIO). (b) any other agency or subdivision that has information resources management duties as the agency or subdivision's primary duty." Does this apply to all OCIO offices within an agency not listed in *Exclusions*?

**A16:** This provision applies only to CIO offices in the Executive Departments (*see* 5 U.S.C. 101), OPM, and the Social Security Administration, as well as the subordinate agencies and offices

under those Departments/agencies.

**Q17**: What does information resources management mean as used in Section 2 of *Exclusions*?

**A17**: The Paperwork Reduction Act defines "information resources management" at 44 U.S.C. § 3502(7), as "the process of managing information resources to accomplish agency missions and to improve agency performance, including through the reduction of information collection burdens on the public."

### April 22, 2025 Additional Questions and Answers

**Q18:** How should agencies handle union time and office space provided to union representatives who are no longer in a recognized unit?

**A18:** Agencies and subdivisions covered by *Exclusions* must reclaim any agency space, furniture, equipment (e.g., computers, phones), and other resources previously utilized by labor unions for representational activities and repurpose those resources for agency business only. Employees of covered agencies and subdivisions who were previously authorized to use taxpayer-funded union time are no longer permitted use of such time and should only be conducting agency-assigned work during their scheduled duty time. Supervisors should not approve any time and attendance records that include requests for and use of taxpayer-funded union time. For agencies and subdivisions not subject to exclusion from collective bargaining, agencies can allow for use of union time and office space as they normally would.

**Q19:** What if an arbitration is already scheduled for an agency or subdivision now excluded under Executive Order 14251?

**A19:** The agency should request that the arbitrator hold the case in abeyance pending the outcome of litigation regarding *Exclusions*. If unable to delay the hearing, the agency should take the position that in accordance with *Exclusions,* the union is no longer the exclusive representative and there is no jurisdiction before the arbitrator.

**Q20:** How does *Exclusions* impact unions' consultation rights under the FSLMRS?

**A20:** The FSLMRS grants labor unions consultation rights under 5 U.S.C. §§ 7113 and 7117(d) on substantive changes to conditions of employment at the national, subnational, and government-wide basis, respectively. Agencies should assess and determine whether labor unions meet the requirements under 5 C.F.R. Part 2426 and take appropriate action with the appropriate FLRA Regional Office where it believes labor unions no longer meet the eligibility criteria for consultation rights. Before taking action, agencies should consult their General Counsel and coordinate with the Department of Justice.

**Q21:** Section 7 of *Exclusions* requires all agency heads with employees covered by Chapter 71, to identify any agency subdivisions with a primary function of intelligence, counterintelligence, investigative, or national security work, that are not covered by Executive Order 12171, as amended. Does this only apply to agencies defined in 5 U.S.C. 101?

**A21:** Section 7 is not limited to those agencies defined under 5 U.S.C. 101 or those listed in *Exclusions*. Rather, every agency head should review their respective missions and identify any

subdivisions with a primary function of intelligence, counterintelligence, investigative, or national security work.

**Q22:** Some employees no longer have union dues or other fees deducted from their government paychecks for union-provided benefits/insurance (e.g., dental, vision, etc.). Is this cessation of payroll deductions considered a life-changing event that would allow employees to opt into federal benefits coverage?

**A22:** Employees should consult with the union or insurance provider from whom they were receiving benefits (i.e., non-FEDVIP plans) regarding coverage questions. If confirmed to have lost coverage, this would be considered a Qualifying Life Event that allows enrollment in a FEDVIP plan outside of Open Season. The individual has from 31 days before to 60 days after the event to enroll. More information is available here: Dental and Vision | BENEFEDS.

**Q23:** May agencies communicate with unions representing employees who are still recognized under Executive Order 14251 (e.g., police officers, security guards, firefighters) or otherwise still recognized under 5 U.S.C. 71?

**A23:** Yes. Unions who have bargaining unit employees that are not excluded under the Executive Order, maintain recognition under Chapter 71 of Title 5, U.S. Code. Therefore, normal labor-management communication and engagement should continue.

**Q24:** How should an agency handle an impending change in conditions of employment for employees now excluded by the Executive Order? How should an agency respond to a union inquiry regarding a change in conditions of employment?

**A24:** An agency or subdivision covered by *Exclusions*, can implement the change without completing negotiations. Agencies may respond to a demand to bargain by a labor union by acknowledging receipt and informing the union that it will hold in abeyance their request pending the outcome of litigation over Executive Order 14251.

**Q25:** What should an agency do if it receives a grievance from the union for an individual or unit that is no longer recognized in accordance with *Exclusions*?

**A25:** For units that are no longer recognized within a covered agency or subdivision, agencies should acknowledge receipt, inform the union that the grievance is being held in abeyance pending litigation for *Exclusions*, and provide a date the agency plans to update them. For grievances that include positions not subject to exclusion from collective bargaining (e.g., police officers, security guards, firefighters), agencies should conduct their negotiated grievance procedures as they normally would.

**Q26:** Should an agency continue to allow union representation in Weingarten meetings and formal discussions with employees excluded under Executive Order 14251?

**A26:** No. Agencies should continue to invite unions to formal discussions and honor requests for Weingarten meeting representation only for employees not excluded from collective bargaining under Executive Order 14251.

**Q27:** If a CBA is set to rollover for units no longer recognized, but the agreement has also not

been terminated, what do we do?

**A27:** In this circumstance, the agency may notify the union that it is terminating the CBA and that any negotiations regarding a successor agreement are being held in abeyance due to *Exclusions* and associated litigation.

**Q28:** If an agency notified a union prior to *Exclusions* that it was terminating a labor-management forum and the union requests to negotiate, how should the agency respond?

**A28:** On March 27, 2025, OPM issued guidance requiring agencies to abolish labor-management forums, committees, and councils at the agency-wide and organizational levels. Many of these forums were established under Executive Order 14119, which was rescinded under Executive Order 14236 in March 2025. The guidance also noted that where the establishment or use of labor-management forums, committees, and councils are incorporated into the terms of any CBA, agencies should seek to renegotiate those terms at the earliest practicable juncture consistent with the policies of this Administration. If a unit that is no longer recognized under *Exclusions* seeks to negotiate over the termination of a forum, the agency should deny the request to bargain since the unit is no longer recognized.

**Q29:** The agency has received unsolicited messages from unions requesting consideration under Section 4 of *Exclusions*, which requires the Departments of Defense and Veterans Affairs to submit any suspensions of *Exclusions* application to the Federal Register within 15 days of the order. How should the agency respond?

**A29:** The agency should acknowledge receipt only and not make any statements regarding the substance of the communication.

**Q30:** Are all OCIOs or equivalents excluded from collective bargaining?

**A30:** Executive Order 14251 excludes the OCIO in "agencies or subdivisions of each Executive department listed in section 101 of title 5, United States Code," and in the Social Security Administration and OPM.

**Q31:** Should agencies respond to union Requests for Information (RFIs) from units that are now excluded in accordance with the *Exclusions* order?

**A31:** If the RFI is filed as a request under 5 U.S.C. 7114(b)(4), agencies should hold the request in abeyance pending the outcome of the litigation.

**Q32:** How should agencies respond to questions regarding union dues?

**A32:** If an excluded employee asks about continuing union dues, the agency should inform the employee that union dues allotments through a government payroll provider are not authorized at this time and that if they wish to continue paying union dues nonetheless, they may contact their union.

**Q33:** How should agencies handle union dues allotments?

**A33:** In taking steps to implement *Exclusions*, agencies may pause the collection of union dues

allotments for those agencies or subdivisions identified in *Exclusions* while litigation is ongoing. However, agency payroll providers should not unilaterally terminate all union dues allotments without first consulting with their customer agencies. Instead, agency payroll providers should contact their customer agencies to identify which labor unions and employees are excluded from collective bargaining by *Exclusions* and limit the termination of dues allotments to those unions and employees.

Exhibit 6



*Estimated Total Annual Burden Hours:* 6 hours.

The following paragraph applies to all the collections of information covered by this notice.

An agency may not conduct or sponsor, and a person is not required to respond to, a collection of information unless the collection of information displays a valid OMB control number. Books or records relating to a collection of information must be retained if their contents may become material in the administration of any internal revenue law. Generally, tax returns and tax return information are confidential, as required by 26 U.S.C. 6103.

*Request for Comments:* Comments submitted in response to this notice will be summarized and/or included in the request for OMB approval. All comments will become a matter of public record. Comments are invited on: (a) whether the collection of information is necessary for the proper performance of the functions of the agency, including whether the information shall have practical utility; (b) the accuracy of the agency's estimate of the burden of the collection of information; (c) ways to enhance the quality, utility, and clarity of the information to be collected; (d) ways to minimize the burden of the collection of information on respondents, including through the use of automated collection techniques or other forms of information technology; and (e) estimates of capital or start-up costs and costs of operation, maintenance, and purchase of services to provide information.

Approved: April 11, 2025.

**Kerry L. Dennis,**

*Tax Analyst.*

[FR Doc. 2025–06493 Filed 4–16–25; 8:45 am]

**BILLING CODE 4830–01–P**

# DEPARTMENT OF VETERANS AFFAIRS

**Order Suspending the Application of Section 1–402 or 1–404 of Executive Order 12171**

**AGENCY:** Department of Veterans Affairs.

**ACTION:** Notice.

**SUMMARY:** An Executive Order (E.O.), issued on March 27, 2025, provides the Secretary of the Department of Veterans Affairs (VA) with delegated authority to suspend the application of sections of a separate Executive Order to any subdivision of the VA that he supervises, thereby bringing those subdivisions under the coverage of the Federal Service Labor-Management Relations Statute.

**DATES:** This suspension is effective upon publication.

**FOR FURTHER INFORMATION CONTACT:** Tracey Therit, Chief Human Capital Officer, Office of Human Resources and Administration/Operations, Security and Preparedness, Department of Veterans Affairs, 810 Vermont Ave. NW, Room 265, Washington, DC, Office: (202) 461–0235, Mobile: (202) 359–8960.

**SUPPLEMENTARY INFORMATION:** Pursuant to the authority provided to the Secretary of the VA in section 4 of E.O. 14251, *Exclusions from Federal Labor-Management Relations Programs,* the VA suspends the application of section 1–402 or 1–404 of Executive Order 12171, as amended, for employees represented by Laborers International Union of North America (LIUNA); Western Federation of Nurses and Health Professionals (WFNHP), Veterans Affairs Staff Nurse Council (VASNC) Local 5032 at the VA Medical Center Milwaukee, WI; International

Association of Fire Fighters (IAFF–99) at the VA Medical Center, Little Rock, AR; United Nurses Association of California/Union of Healthcare Professionals (UNAC/UHCP) at the VA Medical Center, Loma Linda, CA; Teamsters Union Local 115 at the Department of Veterans Affairs Medical Center, Coatesville, PA; International Brotherhood of Electrical Workers (IBEW) Local 2168 at the Cheyenne WY VA Medical Center; and, International Association of Machinists and Aerospace Workers, (IAMAW) Local 1998 at the VA National Cemetery of the Pacific in Honolulu, HI thereby bringing such employees under the coverage of the Federal Service Labor-Management Relations Statute. The Secretary specifically concurs with the President's determinations as set forth in Executive Order 14251 Section 1(b). Specifically, the Secretary agrees the Department of Veterans Affairs has as a primary function national security work, and the requirements of Chapter 71 of title 5 cannot be applied to its operations consistent with national security requirements and considerations.

## Signing Authority

Douglas A. Collins, Secretary of Veterans Affairs, approved this document on April 11, 2025, and authorized the undersigned to sign and submit the document to the Office of the Federal Register for publication electronically as an official document of the Department of Veterans Affairs.

**Michael P. Shores,**

*Director, Office of Regulation Policy & Management, Office of General Counsel, Department of Veterans Affairs.*

[FR Doc. 2025–06566 Filed 4–16–25; 8:45 am]

**BILLING CODE 8320–01–P**

Exhibit 7

identifying locations that might be suitable for locating AOAs and includes limitations specific to that purpose.

Neither the draft AOA Options, nor the AOAs, if any are identified, are pre-permitted sites. Aquaculture can occur within or outside of these areas and each project will be required to comply with all applicable Federal and State laws and regulations regardless of location.

### Requested Information From Interested or Affected Parties

Commenters should be as specific and detailed as possible to help NMFS understand and address comments, including whether your comment pertains to a particular part of the Alaska marine spatial planning study. NMFS recognizes that some information requested below may be considered privileged or confidential, or contain information about historical resources. If you determine that the information you wish to submit may fall under these categories, please do not submit comments via *regulations.gov*, rather contact the agency (contact *alicia.bishop@noaa.gov*) to discuss options for submission. All submissions to *regulations.gov* will be considered public.

NMFS requests comments regarding the following conditions, feasibility, and historic or current activities within or around the Alaska Draft AOA Options:

1. Is there any additional information not included in the marine spatial planning study for one or more of the draft AOA Options that could limit their relative economic and technical suitability? For example:

○ Are there additional thresholds that should be applied to finalize Alaska draft AOA Options, such as, but not limited to: a maximum distance from port or shore and/or minimum/maximum water depth?

○ Are the Alaska draft AOA Options in areas where water quality and biotoxin samples can be collected and transported to the Alaska Department of Environmental Conservation's Environmental Health Lab in Anchorage within the minimum time frames required?

○ Are there specific environmental conditions or other factors that may limit farm access, the number of practical harvest days, gear deployment, or general viability, etc. that have not been considered?

2. Are there geological, geophysical, biological, or bathymetric conditions associated with any of the Alaska draft AOA Options that are not documented in the marine spatial planning study which may impact a site's viability for

aquaculture development? For example, do any of the sites contain seafloor features that would restrict anchoring gear?

3. Is there any additional information not documented in the marine spatial planning study regarding the identification of historic properties, or archaeological and cultural resource sites on the seabed or shoreline overlapping with the Alaska draft AOA Options? This includes potential nearshore and coastal archaeological sites or other historic properties within the areas described in this notice and onshore historic properties, Traditional Cultural Places, or cultural resource sites not documented in the marine spatial planning study that may impact a site's viability for aquaculture development (contact *alicia.bishop@noaa.gov* for options on how to submit privileged, confidential, or historical resources information).

4. Is there any additional existing spatial information not included in the marine spatial planning study about potentially conflicting uses of one or more of the Alaska draft AOA Options, including navigation (commercial shipping and recreational vessel use), fisheries (commercial, recreational, and subsistence), habitat, protected species, or other potential conflicts (contact *alicia.bishop@noaa.gov* for options on how to submit privileged, confidential, or historical resources information)?

5. Is there other relevant socioeconomic, cultural, biological, and/or environmental spatial data and information not documented in the marine spatial planning study?

Responses to this request are voluntary. Respondents need not reply to all questions.

### Accessing Documents

Electronic copies of the marine spatial planning study *An Aquaculture Opportunity Analysis for the Gulf of Alaska* prepared for this action are available from *https://www.regulations.gov* or from the NMFS Alaska Region website at *https://www.fisheries.noaa.gov/action/notice-availability-alaska-draft-aquaculture-opportunity-area-options*.

*Authority:* E.O. 13921.

Date: April 8, 2025.

**Danielle Blacklock,**
*Director, Office of Aquaculture, National Marine Fisheries Service, National Oceanic and Atmospheric Administration.*

[FR Doc. 2025–07029 Filed 4–22–25; 8:45 am]

**BILLING CODE 3510–22–P**

## DEPARTMENT OF DEFENSE

### Office of the Secretary

### Executive Order 14251 Certification

**AGENCY:** Department of Defense (DoD).
**ACTION:** Notice of certification.

---

**SUMMARY:** The notice announces publication of the certification from the Secretary of Defense to the President that the provisions of the Federal Service Labor Management Relations Statute can be applied to the subdivisions listed in the **SUPPLEMENTARY INFORMATION** section in a manner consistent with national security requirements and consideration.

**FOR FURTHER INFORMATION CONTACT:** Tim Dill, (703) 697–2121.

**SUPPLEMENTARY INFORMATION:** I specifically concur with the President's determinations as set forth in Executive Order 14251, Section 1(b). Specifically, I agree that the Department of Defense has as a primary function national security work, and the requirements of Chapter 71 of title 5 cannot be applied to its operations consistent with national security requirements and considerations.

Pursuant to section 1–499 of Executive Order 14251, *Exclusions from Federal Labor Management Relations Programs,* dated March 27, 2025, I hereby determine and certify to the President of the United States that the provisions of the Federal Service Labor-Management Relations Statute can be applied to the following federal wage system employees in the trades at the following DoD component subdivisions in a manner consistent with national security requirements and considerations.

(a) Letterkenny Munition Center, US Army Aviation and Missile Command, United States Army.

(b) Air Force Test Center, Air Force Materiel Command, Department of Air Force.

(c) Air Force Sustainment Center, Air Force Materiel Command, Department of Air Force.

(d) Fleet Readiness Center Southeast.

This determination and certification shall be transmitted to the President of the United States and published in the **Federal Register**.

### Signing Authority

Pete Hegseth, Secretary of Defense, approved this document on April 17, 2025, and authorized the undersigned to sign and submit the document to the Office of the Federal Register for publication electronically as an official document of the Department of Defense.

Dated: April 17, 2025.

**Jules W. Hurst III,**

*Deputy Assistant Secretary of Defense for Force Readiness, Performing the Duties of the Assistant Secretary of Defense for Readiness, Performing the Duties of the Under Secretary of Defense for Personnel and Readiness.*

[FR Doc. 2025–07054 Filed 4–22–25; 8:45 am]

**BILLING CODE 6001–FR–P**

---

## DEPARTMENT OF DEFENSE

### Department of the Army, Corps of Engineers

[COE–2024–0004]

### Thomas R. Carper Water Resources Development Act of 2024; Notice of Comment Period Extension

**AGENCY:** U.S. Army Corps of Engineers, Department of the Army, Department of Defense.

**ACTION:** Request for comments; extension of comment period.

**SUMMARY:** On February 27, 2025, the Office of the Assistant Secretary of the Army for Civil Works (OASA(CW)) published a notice in the **Federal Register** seeking public comment on any provisions in the Thomas R. Carper Water Resources Development Act (WRDA) of 2024. The OASA(CW) invited the public to submit written comments on the development and issuance of guidance to implement WRDA 2024 during a 60-day public comment period ending on April 28, 2025. Due to an outage with the General Services Administration eRulemaking services from April 25 through April 28, 2025, the OASA(CW) is extending the public comment period by 2 days.

**DATES:** The comment period for the notice published February 27, 2025 at 90 FR 10818 is extended. Submit comments by April 30, 2025.

**ADDRESSES:** You may submit written comments, identified by Docket ID No. COE–2024–0004, by any of the following methods: *Federal eRulemaking Portal: https:// www.regulations.gov/.* Follow the online instructions for submitting comments.

*Email:* WRDA2024@usace.army.mil. Include Docket ID No. COE–2024–0004 in the subject line of the message.

*Mail:* U.S. Army Corps of Engineers, ATTN: Ms. Amy Frantz, CEW–P, U.S. Army Corps of Engineers, 3F91, 441 G St NW, Washington, DC 20314.

*Hand Delivery/Courier:* Due to security requirements, we cannot receive comments by hand delivery or courier. Comments received may be posted without change to *https://*

*www.regulations.gov/,* including any personal information provided.

**FOR FURTHER INFORMATION CONTACT:** All requests for further information on the notice may be directed to Ms. Lauren Leuck, OASA(CW), at 703–839–0383 or *lauren.d.leuck.civ@army.mil.*

**SUPPLEMENTARY INFORMATION:** This comment period regarding WRDA 2024 (Pub. L. 118–272) is being conducted in accordance with section 1105 of the Water Resources Development Act of 2018 (Pub. L. 115–270). A copy of WRDA 2024 can be found at the publicly accessible website: *https:// www.usace.army.mil/Missions/Civil-Works/Water-Resources-Development-Act/.* Final written guidance will be available to the public on the same website.

**D. Lee Forsgren,**

*Acting Assistant Secretary of the Army for Civil Works.*

[FR Doc. 2025–07022 Filed 4–22–25; 8:45 am]

**BILLING CODE 3720–58–P**

---

## DEPARTMENT OF DEFENSE

### Department of the Navy

### Meeting of the U.S. Naval Academy Board of Visitors

**AGENCY:** Department of the Navy (DoN), Department of Defense (DoD).

**ACTION:** Notice of partially closed meeting.

**SUMMARY:** The DoD is publishing this notice to announce that the following Federal Advisory Committee meeting of the U.S. Naval Academy Board of Visitors, hereafter ''Board,'' will take place.

**DATES:** Open to the public, May 05, 2025, from 9 a.m. to 11 a.m. Eastern Time Zone (ET). Closed to the public, May 05, 2025, from 11 a.m. to noon (12 p.m.) ET.

**ADDRESSES:** This meeting will be held at the U.S. Naval Academy, Annapolis, MD. Pending prevailing health directives, the meeting will be handicap accessible. Escort is required.

**FOR FURTHER INFORMATION CONTACT:** Lieutenant Commander Ross Hammerer, USN, Executive Secretary to the Board of Visitors, Office of the Superintendent, U.S. Naval Academy, Annapolis, MD 21402–5000, 410–293–1503, *hammerer@usna.edu,* or visit *https:// www.usna.edu/PAO/Superintendent/ bov.php.*

**SUPPLEMENTARY INFORMATION:** This meeting is being held under the provisions of the Federal Advisory

Committee Act (FACA) of 1972 (5 United States Code (U.S.C.), appendix, as amended), the Government in the Sunshine Act of 1976 (5 U.S.C. 552b, as amended), and the General Services Administration's (GSA) Federal Advisory Committee Management Final Rule (41 CFR part 102–3).

*Purpose of Meeting:* The U.S. Naval Academy Board of Visitors will meet to make such inquiry, as the Board deems necessary, into the state of morale and discipline, the curriculum, instruction, physical equipment, fiscal affairs, and academic methods of the Naval Academy.

*Agenda:*

Proposed meeting agenda for May 05, 2025.

0900   Call to Order (Open to Public)
0900–1055   Opening Meeting (Open to Public)
1055–1100   Break (Open to Public)
1100–1200   Closed Meeting (Closed to Public)

Current details on the board of visitors may be found at *https:// www.usna.edu/PAO/Superintendent/ bov.php.*

The closed meeting from 11:00 a.m. to 12:00 p.m. ET on May 05, 2025, will consist of discussions of new and pending administrative or minor disciplinary infractions and non-judicial punishments involving midshipmen attending the Naval Academy to include but not limited to, individual honor or conduct violations within the Brigade, the disclosure of which would constitute a clearly unwarranted invasion of personal privacy. For this reason, a portion of this meeting will be closed to the public, as the discussion of such information cannot be adequately segregated from other topics, which precludes opening the closed meeting to the public. The Principal Deputy General Counsel has determined in writing that the meeting shall be partially closed to the public because the discussions during the closed meeting from 11 a.m. to noon (12 p.m.) will be concerned with matters protected under sections 552b(c) (5), (6), and (7) of title 5, U.S.C.

Due to circumstances beyond the control of the Designated Federal Officer and the Department of Defense, the United States Naval Academy Board of Visitors was unable to provide public notification required by 41 CFR 102–3.150(a) concerning its May 5, 2025 meeting. Accordingly, the Advisory Committee Management Officer for the Department of Defense, pursuant to 41 CFR 102–3.150(b), waives the 15-calendar day notification requirement.

*Meeting Accessibility:* Pursuant to FACA and 41 CFR 102–3.140, this

Exhibit 8



An official website of the United States government  Here's how you know ⌄

⭐ Talk to the Veterans Crisis Line now

VA.gov    Locations    Business    VA Careers

Contact Us

**VA** | News

News ⌄      Resources ⌄       VA Podcast Network

VA Press Room     🔍

Press Room

# VA terminates union contracts for most bargaining-unit employees

FOR IMMEDIATE RELEASE

August 6, 2025  3:35 pm

Last updated August 6, 2025



U.S. Department of Veterans Affairs
810 Vermont Ave., NW
Washington, DC 20420
1-800-698-2411

**VA**
New

An
offic
web
of
the
Dep
of
Vete
Affa

VA.g

Choc

Disc

Digit

VA
Outr
Ever

VA
Form

VA
Publ

Abou
VA

VA
mob
apps

Acce
at
VA

# The move will ensure VA stays focused on Veterans instead of spending millions of taxpayer dollars and approximately 750,000 hours per year on union activities

WASHINGTON — The U.S. Department of Veterans Affairs today announced the termination of collective bargaining agreements for most VA bargaining-unit employees, a move that will make it easier for VA leaders to promote high-performing employees, hold poor performers accountable, and improve benefits and services to America's Veterans.

The announcement comes in response to President Trump's executive order that excludes certain federal agencies from labor-management relations programs. In accordance with the same EO, VA on April 25 stopped withholding union dues from most employees' paychecks.

VA today notified the following unions that, effective immediately, pursuant to the EO their contracts with VA have been terminated for most bargaining-unit employees: American Federation of Government Employees, AFL-CIO (AFGE); National Association of Government Employees (NAGE); National Federation of Federal Employees (NFFE); National Nurses Organizing Committee/National Nurses United (NNOC/NNU); and the Service Employees International Union (SEIU).

Contracts covering the roughly 4,000 VA police officers, firefighters or security guards represented by these unions

will remain in place, as those occupations are exempt from the EO.

This decision is good news for Veterans, families, caregivers and survivors for several reasons:

• VA staff will spend more time with Veterans: In 2024 alone, over 1,900 VA bargaining-unit employees spent more than 750,000 hours of work on taxpayer funded union time – including some who are paid more than $200,000 a year. With no collective bargaining obligations, those hours can now be used to serve Veterans instead of union bosses.

• VA facilities can focus on treating Veterans instead of hosting unions: More than 187,000 square feet of VA's office and clinical space is currently being used by union representatives, free of charge. This has cost VA millions of dollars in lost rent and expenses for union bosses' government phones and computer equipment. Today's decision will ensure VA facilities are fully focused on helping Veterans get the care and benefits they've earned, instead of serving as free regional offices for unions that oppose our efforts to improve VA.

• VA can manage its staff according to Veterans' needs, not union demands: Labor contracts have restricted managers' ability to hire, promote and reward high-performing employees, hold poor performers accountable and implement reforms to better serve Veterans. Today's decision frees VA managers to act in the best interests of Veterans rather than union bosses.

"Too often, unions that represent VA employees fight against the best interests of Veterans while protecting and rewarding bad workers," said VA Secretary Doug Collins. "We're making sure VA resources and employees are singularly focused on the job we were sent here to do:

No
FEAR
Act
data

Whis
Prot

Offic
of
the
Insp
Gene

VA
plan
budg
finan
and
perfo

Agen
Fina
Repo

Priva
polic

FOIA
requ

Discl

Oper
data

Vuln
discl
polic

Copy
polic

Look
for
U.S.

providing top-notch care and service to those who wore the uniform."

Background

VA-employee unions have repeatedly opposed significant, bipartisan VA reforms and rewarded bad employees for misconduct. Examples include:

• AFGE, NFFE and NNOC/NNU opposed the MISSION Act, a law that makes it easier for Veterans to get health care.

• NFFE supports rescinding the VA Accountability and Whistleblower Protection Act, a law designed to protect whistleblowers and hold employees accountable for misconduct.

• AFGE worked hand-in-hand with the Biden Administration to reinstate more than 100 former employees fired for misconduct during the first Trump Administration and pay nearly $134 million to some 1,700 former VA employees who were fired for misconduct during President Trump's first term.

---



Reporters and media outlets with questions or comments should contact the Office of Media Relations at vapublicaffairs@va.gov



Veterans with questions about their health care and benefits (including GI Bill). Questions, updates and documents can be submitted online.

Contact us online through Ask VA



Veterans can also use our chatbot to get information about VA benefits and services. The chatbot won't connect you with a person, but it can show you where to go on VA.gov to find answers to some common questions.

[Learn about our chatbot and ask a question](#)



[Subscribe today](#) to receive these news releases in your inbox.

**Topics**    bargaining-unit    union contracts

---



# More from the Press Room

NEWS RELEASES

AUGUST 13, 2025

## VA processes more claims in a single year than ever before

VA processes more disability benefits compensation & pension ratings claims in a single year than ever before.

NEWS RELEASES

AUGUST 11, 2025

## Simplified travel claims submissions now available on VA mobile app

Eligible Veterans can now submit and track "mileage-only" travel claims directly from a smartphone or mobile device via the VA Health and Benefits mobile app.

NEWS RELEASES

AUGUST 4, 2025

## VA offers yearlong community care authorizations for 30 services

VA extends community care authorizations for eligible standardized types of care for a year.

Exhibit 9

**From:** Coomber, Robert <coomber.robert@epa.gov>
**Sent:** Friday, August 8, 2025 1:58 PM
**To:** ███████████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████
**Cc:** Castro, Denise <Castro.Denise@epa.gov>
**Subject:** Termination of Union Contracts at EPA

Dear EPA Employees,

You are receiving this email because you are a union point of contact or have reported the use of official time in the recent past and are in the American Federation of Government Employees, Council 238 (AFGE); National Association of Government Employees, Local R5-55 (NAGE R4);  National Association of Government Employees, Local R1-240 (NAGE Narraganset); Engineers and Scientists of California, IFPTE Local 20 (ESC); or National Association of Independent Labor, Local R1-240 (NAIL) bargaining units at EPA. EPA's contracts with AFGE, NAGE R4, NAGE Narraganset, ESC and NAIL are hereby terminated.

Employees in the AFGE, NAGE R4, NAGE Nar, ESC or NAIL bargaining units should be aware of the following:

1. As an EPA employee, you must perform 100% agency business while on agency duty time. Work on behalf of the union may only be performed when you are not scheduled to work or are on appropriate and approved leave.

    Employees requiring additional training on how to perform non-union EPA duties must work with their supervisors who will determine what additional training may be needed.

    **Official time will not be approved for employees in the bargaining units noted above beyond pay period 17 – *i.e.*, August 9, 2025, is the final day for which official time will be approved for employees in the bargaining units noted above.**

2. EPA will reclaim its office spaces, and those spaces will be utilized exclusively for agency purposes. More details on the reacquisition of space will come from local management officials.

3. The grievance procedures of the CBAs are no longer in effect. EPA will not engage in any grievance procedures of the CBA's.

4. Arbitrators will be compensated for the work performed to date, but no additional time will be paid by the Agency. Any arbitration decisions will be treated as nonbinding. EPA will not engage in any arbitration proceedings under the CBA's.

5. Employees may not use agency equipment or systems to perform union work. If you would like to provide the Agency with non-agency union contact information and have not already, you can send it to my email address at coomber.robert@epa.gov.

As background, on March 27, 2025, President Trump issued Executive Order 14251 (the EO). On June 24, 2025, the Northern District of California enjoined the implementation of the EO. On August 1, 2025, the 9th Circuit Court of Appeals granted a stay of the Northern District of California's preliminary injunction, finding the government "suffers irreparable harm . . . in the national security context" because of the injunction.

To prevent irreparable harm to national security and consistent with the 9th Circuit Court decision noted above, the EPA determined it is necessary to terminate its contracts with AFGE, NAGE R4, NAGE Narragansett, ESC, and NAIL.

Bob

**Bob Coomber**
Senior Labor Advisor
**Office of Mission Support**
U.S. Environmental Protection Agency
**Office:** (202) 564-0955
**Mobile:** (202) 236-4965
**Email:** coomber.robert@epa.gov



*They can because we do!*

*Please note that I sent this at a time that was convenient for me without expectation for a response outside of business hours. If you receive this email outside of your normal working hours, please know that I do not expect a response until you are back at work during your normal hours.*

Exhibit 10



**U.S. Department of
Homeland Security**

**United States
Coast Guard**

Commandant
United States Coast Guard

2703 Martin Luther King Jr. Ave SE
Washington D.C. 20593-7000
(202) 372-4500

12711
8 Aug 2025

# MEMORANDUM

From:    M.H. Day, RADM
         Deputy Commandant for Personnel

To:      William Huff
         International Association of Machinists and Aerospace Workers, AFL-CIO Local 2203

Subj:    Executive Order 14, 251 Exclusions from Federal Labor-Management Relations
         Programs

1. I am writing to confirm that, except for the exclusions set forth in Executive Order 14, 251, the United State Coast Guard's contract with the International Association of Machinists and Aerospace Workers AFL-CIO Local 2203 is terminated effective immediately.

2. Questions related to this memorandum should be directed to: SMB-COMDT-CG124-LaborRelationsDivision@uscg.mil

3. We appreciate your time and attention to this matter.

Exhibit 11



**U.S. Department of Justice**

Civil Division, Appellate Staff

950 Pennsylvania Ave. NW, Rm. 7258
Washington, DC 20530

Tel: (202) 616-5364

August 14, 2025

VIA ACMS

Molly Dwyer
Clerk of Court
U.S. Court of Appeals for the Ninth Circuit
P.O. Box 193939
San Francisco, CA 94119-3939

　　　Re:　*American Federation of Government Employees, AFL-CIO (AFGE) v.
　　　　　　Trump*, No. 25-4014 (9th Cir.)

Dear Ms. Dwyer:

　　　Defendants submit this letter to update the Court that several defendant-
agencies have terminated certain collective bargaining agreements. For example,
the Department of Veterans Affairs has terminated master collective bargaining
agreements and associated agreements with the American Federation of
Government Employees (AFGE), the National Association of Government
Employees (NAGE), the Service Employees International Union (SEIU), the
National Nurses Organizing Committee/National Nurses United (NNOC/NNU),
and the National Federation of Federal Employees (NFFE), except insofar as those
agreements cover employees who were exempted from Executive Order 14,251's
coverage (e.g., police officers, firefighters, and security guards).

　　　In addition, on August 13, 2025, the Office of Personnel Management
revised A1 of the Frequently Asked Questions document located at ER-125. It now
reads as follows:

**Q1:** What do agencies need to do to terminate applicable CBAs?

**A1:** Due to ongoing litigation, agencies should not terminate, abrogate, or repudiate any CBAs with the National Treasury Employees Union (NTEU) until the conclusion of litigation or further guidance. Agencies may choose to terminate, abrogate, or repudiate CBAs with other unions, and should consult with their General Counsels to assess next steps regarding those CBAs.

As this Court observed in staying the district court's preliminary injunction pending appeal, "any terminated agreements can be reinstated if Plaintiffs ultimately prevail." *AFGE v. Trump*, No. 25-4104, 2025 WL 2180674, at *5 (9th Cir. Aug. 1, 2025). Accordingly, it remains the case that plaintiffs' alleged harms—which are already "speculative"—do not outweigh the harm that the injunction imposed on the government. *Id.* at 5.

Sincerely,

s/ *Benjamin T. Takemoto*
Benjamin T. Takemoto

cc:    All parties (via ACMS)